1   Judith Cregan, Bar No. 208779
    jcregan@littler.com
2   LITTLER MENDELSON, P.C.
    500 Capitol Mall, Suite 2000
3   Sacramento, California 95814
    Telephone: 916.830.7200
4   Facsimile: 916.561.0828

5   Attorneys for Defendant
    MULTIPLAN INC.
6

7              UNITED STATES DISTRICT COURT

8              EASTERN DISTRICT OF CALIFORNIA

9

10  JAMES BREWER, an individual,                   Case No.

11          Plaintiff,                             *[Removed from Shasta Superior Court
                                                   Case No. 25CV-0207044]*
12      v.
                                                   **DECLARATION OF JUDITH
13  MULTIPLAN INC., and DOES 1 through             CREGAN IN SUPPORT OF
    25,                                            DEFENDANT'S REMOVAL OF CIVIL
14                                                 ACTION TO FEDERAL COURT**
            Defendants.
15                                                 Trial Date:       Not Yet Set
                                                   Complaint Filed:  February 14, 2025
16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JUDITH CREGAN IN SUPPORT OF DEFENDANT'S
REMOVAL OF CIVIL ACTION TO FEDERAL COURT

I, Judith Cregan, do hereby declare and state as follows:

1.     I am an attorney with Littler Mendelson, P.C., attorneys of record for Defendant MULTIPLAN, INC. (hereinafter, "Defendant"). I am duly licensed to practice law before the courts of the State of California and have been admitted to practice in the United States District Court for the Eastern District of California. I have personal knowledge of the facts set forth below and, if called upon to testify regarding the matters contained in this Declaration, I could and would competently do so.

2.     On February 14, 2025, Plaintiff James Brewer filed a lawsuit in the Superior Court for the State of California, in and for the County of Shasta, captioned *James Brewer, an individual, v. Multiplan Inc; and DOES 1 through 25, inclusive, Defendants*, Case No. 25CV-0207044.  Attached hereto as **Exhibit A** is a true and correct copy of the Complaint. At the same time, Plaintiff served Defendant with the Summons, Complaint, Notice of All-Purpose Assignment, Mandatory Settlement Conference, and Trial, the Superior Court of California, County of Shasta Alternative Dispute Resolution (ADR) Information Package, and Civil Case Cover Sheet on February 21, 2025.  Plaintiff served Defendant with only the first page of the Complaint in the packet of documents served on Defendant. A true and correct copy of the packet of documents Plaintiff served on Defendant is attached hereto as **Exhibit B** and constitutes all processes, pleadings and orders served upon Defendant in this action to the present date and all document filed with the state court to date.

3.     On March 21, 2025, Defendant filed an Answer in the California State Court for the County of Shasta and served a copy of that Answer on Plaintiff's counsel of record. Attached hereto as **Exhibit C** is a true and correct copy of Defendant's Answer.

4.     To Defendant's knowledge, no further process, pleadings, or orders related to this case have been filed in Shasta County Superior Court or served by any party other than as described above.

5.     To Defendant's knowledge, no proceedings related hereto have been heard in Shasta County Superior Court.

/ / /

DECLARATION OF JUDITH CREGAN IN SUPPORT OF DEFENDANT'S
REMOVAL OF CIVIL ACTION TO FEDERAL COURT

6.      Attached hereto as **Exhibit D** is a true and correct copy of LexisNexis's VerdictSearch with the jury verdict sums for the cases cited in Defendant's Removal of Civil Action to Federal Court.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed at Grass Valley, California on this 21st day of March 2025.

JUDITH CREGAN

4919-7986-7691 / 066692.1021

DECLARATION OF JUDITH CREGAN IN SUPPORT OF DEFENDANT'S
REMOVAL OF CIVIL ACTION TO FEDERAL COURT

# EXHIBIT "A"



1  Zak Franklin (SBN 302042)
   Danica Li (SBN 308650)
2  **FRANKLIN LAW P.C.**
   100 Wilshire Blvd., Ste. 700
3  Santa Monica, California 90401
   Telephone: (424) 258-5129
4  zak@franklinlawpc.com
   danica@franklinlawpc.com
5
   Attorneys for Plaintiff
6  James Brewer

7

8                    **SUPERIOR COURT OF CALIFORNIA**

9                         **COUNTY OF SHASTA**                    **207044**

10 James Brewer, an individual;              Case No.:

11                                            **COMPLAINT FOR DAMAGES**

12            Plaintiff,                      1.  **Wrongful Termination in Violation of**
                                                  **Public Policy**
13     vs.                                    2.  **Violation of Labor Code § 1102.5(b):**
                                                  **Retaliation**
14                                            3.  **Failure to Timely Pay Earned Bonuses**
   Multiplan Inc.; and Does 1 through 25,         **In Violation of Labor Code § 204**
15                                            4.  **Failure to Timely Pay Wages In**
                                                  **Violation of Labor Code §§ 201, 202**
16            Defendants.                     5.  **Defamation**
                                              6.  **Failure to Provide Personnel Records**
17                                            7.  **Failure to Provide Payroll Records**

18                                            **DEMAND FOR JURY TRIAL**

19

20

21

22

23

24

25

26

27

28

─────────────────────────────────────────────
                         **COMPLAINT**

## INTRODUCTION

Plaintiff James Brewer hereby brings this action against Defendants Multiplan Inc., and Does 1-25 (collectively, "Defendants").

## JURISDICTION AND VENUE

1.    Jurisdiction and venue are proper in this Court because Defendants maintain or maintained their principal offices in and does or did business in California at all times relevant to this action, Defendants agreed to employ Plaintiff in Shasta County, California, Plaintiff and Defendants are and were citizens of California at all times relevant to this action, and the events giving rise to the claims alleged herein occurred in Shasta County, California.

2.    The amount in controversy in this matter exceeds the sum of $25,000, exclusive of interest and costs.

## PARTIES

3.    Plaintiff James Brewer is an individual and is a resident of Shasta County, California.

4.    Defendant Multiplan Inc. ("Multiplan") is and was at all times relevant to this action, a private entity and employer operating and employing individuals within the state of California, with its California offices located in Lake Forest, CA, and Laguna Hills, CA. Multiplan had more than five employees at all times relevant to this action.

5.    Plaintiff is informed and believe that Does 1 through 25 are corporations, individuals, limited liability partnerships, limited liability companies, general partnerships, sole proprietorships, government entities, or non-profit organizations or are other business entities or organizations of a nature not currently known to Plaintiff.

6.    Plaintiff is unaware of the true names of Does 1 through 25. Plaintiff sues said defendants by said fictitious name, and Plaintiff will amend this complaint when the true names and capacities are ascertained or when such facts pertaining to liability are ascertained, or as permitted by law or by the Court. Plaintiff is informed and believes that each of the fictitiously

1 named Defendants is in some manner responsible for the events and allegations set forth in this
2 complaint.

3      7.     Plaintiff is informed and believe, and thereon allege, that at all times herein
4 mentioned each Defendant, including all Defendants sued under fictitious names, was the agent,
5 employee, or representative of each of the remaining Defendant, and in doing the things
6 hereinafter alleged, was at times acting within the course and scope of this agency or
7 employment, and at other times, acting in his or her own individual capacity. In the alternative,
8 each of the individually named Defendants, acted in concert and in furtherance of a fraudulent
9 plan and scheme and each actively participated in the wrongful acts alleged in this complaint.

10                    **FACTS COMMON TO ALL CAUSES OF ACTION**

11     8.     Plaintiff worked for Defendants from approximately October 2023 until
12 November 5, 2024. Plaintiff's position was Claims Resolution Specialist.  Plaintiff worked
13 remotely from home.  Multiplan paid Plaintiff about $45,000 a year.

14     9.     Plaintiff's duties as a Claims Resolution Specialist involved negotiating payments
15 to medical providers on behalf of insurers. In particular, Plaintiff negotiated out-of-network
16 claims, in cases where providers were attempting to bill patients for medical services rendered.
17 In these cases, Plaintiff would negotiate with providers on behalf of insurers to broker
18 settlements of these claims.

19     10.    Plaintiff was a successful and well-evaluated employee who scored in the top-tier
20 during multiple performance evaluations and earned bonuses on a quarterly basis for his quality
21 work.

22     11.    Because of the quality of Plaintiff's work, Defendants paid him bonuses on a
23 quarterly basis. Defendants did not miss paying Plaintiff bonuses for any quarter Plaintiff was
24 employed with Defendants, until the third quarter of 2024, as discussed further below.

25     12.    Plaintiff's direct supervisor from approximately February 2024 onward was
26 Claims Resolutions Supervisor Celeste Porter. Ms. Porter gave Plaintiff positive performance
27 reviews.

28

2<br>**COMPLAINT**

13.    In approximately June or July 2024, Plaintiff had a call with a medical provider who he discovered was engaged in the practice of "balance billing". "Balance billing" is an illegal practice whereby a medical provider negotiates and agrees to a settlement which provides for a payment from the insurer as the full payment for the services rendered, but nevertheless still bills the patient separately. In other words, the provider double-dips by accepting from the insurer full payment for services rendered, but then thereafter still bills the patient.

14.    On this call, the provider informed Plaintiff of his intention to both take the money offered by the insurer under his settlement agreement and also to bill the patient regardless of the terms of the agreement, which forbid this conduct.

15.    In approximately June or July 2024, Plaintiff reported to Ms. Porter that this provider he had been speaking to was engaged in the practice of balance billing, including by sending her a recording of the call and stating to her his belief that the provider was potentially engaged in illegal balance billing. Plaintiff stated to Ms. Porter that they needed to report this provider to Multiplan's Balance Billing department, so that they could take steps to remediate the situation. When Ms. Porter incorrectly responded that Multiplan had no balance billing department, Plaintiff corrected her and informed her that there was one.

16.    In the weeks after Plaintiff's report, Ms. Porter immediately began retaliating against Plaintiff. Ms. Porter, *inter alia*, increased his workload, criticized his performance, micromanaged his work, overwrote Plaintiff's offers in settlement negotiations, effected adverse impacts to the metrics which measured Plaintiff's work performance, and required Plaintiff to meet with her two to four times a week.

17.    On or about October 17, 2024, Plaintiff filed a written complaint with Multiplan through their ethics website, writing, *inter alia*, that he had reason to believe that Ms. Porter had shared his private information with a provider, that she was harassing and retaliating against him for reporting the balance billing issue, and that she was violating her duties to the insurer by giving providers whatever they requested. Plaintiff also wrote that he suspected Ms. Porter was receiving illegal kickbacks from providers.

18.     In late October 2024, Plaintiff spoke to a Human Resources manager named Diane Hale, who indicated she would investigate Plaintiff's complaint and speak to Ms. Porter about the complaint.

19.     Shortly thereafter, Ms. Hale contacted Plaintiff and informed him that she had spoken to Ms. Porter, that Ms. Porter had denied all Plaintiff's allegations, and that therefore there was no finding of wrongdoing and the investigation was concluded.

20.     On November 5, 2024, Plaintiff was required to attend a call with Human Resources managers Eliza Ibarra and Ms. Porter's supervisor Angie Canterbury. Ms. Ibarra claimed Plaintiff had committed fraud and advised him that he was being terminated. Plaintiff pressed for specific examples. Ms. Ibarra claimed that Plaintiff had made a typo in a note, but would not give any further examples. Plaintiff made clear the typo was accidental and insisted that fraud requires intent, which he did not have. When Plaintiff pressed further, Ms. Ibarra and Ms. Canterbury unceremoniously shut down the call mid-conversation, leaving Plaintiff sitting by himself, stunned and in shock.

21.     Soon thereafter, Plaintiff received an email from Multiplan stating that he was being terminated for "misconduct," in particular for "falsifying business records."

22.     Over the course of his employment, Plaintiff observed numerous employees and coworkers fill in paperwork in an erroneous manner, including by filling out documents with erroneous phone numbers, but none of those employees were subjected to any kind of discipline for this conduct.

23.     At no point in time during his employment with Multiplan did Plaintiff commit fraud.

24.     Defendants fired Plaintiff just a few days before his quarterly bonus was due to be paid to Plaintiff, in early November 2024.

25.     On November 14, 2024, Plaintiff, through his counsel, and in writing, requested that Multiplan produce Plaintiff's personnel records and payroll records.

4<br>COMPLAINT

26.   On January 9, 2025, Multiplan untimely responded and provided a link through which to download Plaintiff's personnel records and payroll records.

27.   Plaintiff did not at any point agree with Multiplan to extend the thirty (30) day deadline to provide Plaintiff's personnel records or the twenty-one (21) day deadline to provide Plaintiff's payroll records.

28.   In or about late 2024, Plaintiff applied for unemployment insurance with the Employment Development Department ("EDD"). The EDD, however, informed him that his benefits had been denied, which led Plaintiff to believe that Multiplan had contested his benefits.

29.   Since his termination, Plaintiff has been diligently applying for jobs with potential employers, including by sending out his resume with Multiplan listed as his last employer. However, he has not yet received a job offer.

30.   Upon information and belief, Defendants published falsehoods about Plaintiff committing fraud to employees within Multiplan, individuals at the EDD, potential employers, and/or providers.

## FIRST CAUSE OF ACTION

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

### (Against All Defendants)

31.   Plaintiff incorporates all of the preceding paragraphs of this complaint as if fully alleged herein.

32.   It is against the public policy of California to discharge an employee because that employee engages in protected activity, such as whistleblowing. *See, e.g.*, Cal. Gov't Code § 12940 et seq.; Cal. Labor Code § 970.

33.   As set forth more fully above, Defendants terminated Plaintiff's employment in whole or in part because of his protected activities, including reporting the illegal practice of balance billing to his supervisor.

34.   By engaging in the above-described conduct, Defendants terminated Plaintiff's employment in violation of California public policy.

35.   As a direct, legal, and proximate result of Defendants' conduct, as alleged above, Plaintiff endured emotional distress, loss of wages and benefits pursuant to which Plaintiff is entitled to general and special damages according to proof.

## SECOND CAUSE OF ACTION

### VIOLATION OF LABOR CODE § 1102.5(b)

### RETALIATION

#### (Against all Defendants)

36.   Plaintiff incorporates all of the preceding paragraphs of this complaint as if fully alleged herein.

37.   Labor Code § 1102.5(b) states in pertinent part as follows: An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, ... to a person with authority over the employer or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, ... if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

38.   Defendants violated Labor Code § 1102.5 against Plaintiff by taking adverse action against Plaintiff because Plaintiff reported the illegal practice of balance billing to his supervisor.

39.   Plaintiff had reasonable cause to believe that the complaints constituted violations of or noncompliance with state or federal statutes, rules or regulations prohibiting discrimination, harassment, and retaliation in the workplace including, but not limited to, California Government Code § 12900 et seq.

40.   The unlawful conduct alleged above was engaged in by the officers, directors, supervisors and/or managing agents of Defendants' and/or Does 1-50, who were acting at all times relevant to this Complaint within the scope and course of their employment.

1    41.    As a direct, legal, and proximate result of Defendants' conduct, as alleged above,

2 Plaintiff endured emotional distress, loss of wages and benefits, pursuant to which Plaintiff is

3 entitled to general and special damages according to proof.

4    42.    As a further direct, legal and proximate result of Defendants' conduct, Plaintiff

5 was caused to and did employ the services of counsel to prosecute this action and is accordingly

6 entitled to an award of attorneys' fees according to proof. Labor Code § 1102.5(j).

7    43.    Plaintiff is informed and believes and thereupon alleges that Defendants' actions

8 were taken with malice, oppression, fraud, and/or willful and conscious disregard of Plaintiff's

9 rights; and were carried out by Defendants' managing agents and/or ratified by Defendants.

10 Plaintiff is therefore entitled to punitive damages in an amount to be determined at trial.

11    44.    Wherefore, Plaintiff has been damaged as set forth above and requests relief as

12 hereafter provided.

13                            **THIRD CAUSE OF ACTION**

14                        **FAILURE TO PAY EARNED BONUSES**

15                            **(Against all Defendants)**

16    45.    Plaintiff incorporates all of the foregoing paragraphs of this complaint as if fully

17 alleged herein.

18    46.    Labor Code § 204(a) requires that all wages, including bonuses, once earned, be

19 paid on the regular payday for the work performed or within a reasonable time thereafter.

20    47.    Once Plaintiff's bonuses were earned, Defendants were required to promptly pay

21 Plaintiff the earned bonuses in compliance with Labor Code § 204(a).

22    48.    Defendants paid Plaintiff his quarterly bonuses for every quarter during his

23 employment until the third quarter of 2024.

24    49.    Plaintiff earned his bonus for the third quarter of 2024. The bonuses were due and

25 payable in early November 2024.

26    50.    Defendants failed to pay the amounts owed to Plaintiff as required.

27    51.    Defendants terminated Plaintiff to avoid paying him the bonuses earned.

28

52.    Plaintiff has been damaged by Defendants' failure to comply with Labor Code § 204(a) and to promptly pay Plaintiff's earned bonuses. Defendants' failure to timely pay earned bonuses and wages were willful and intentional violations.

53.    Wherefore, Plaintiff has been damaged as set forth above and requests relief as hereafter provided.

## FOURTH CAUSE OF ACTION

### FAILURE TO TIMELY PAY FINAL WAGES UPON TERMINATION OF EMPLOYMENT AND WAITING PENALTIES DUE TO WILLFUL DELAY

#### (Against all Defendants)

54.    Plaintiff incorporates all of the following paragraphs of this complaint as if fully alleged herein.

55.    At all relevant times, Plaintiff was an employee of Defendants covered by Labor Code §§ 201 or 202, whose employment by Defendants ended in November 2024.

56.    Pursuant to Labor Code § 201, Plaintiff was entitled upon termination to timely payment of all wages earned and unpaid prior to termination. Discharged employees are entitled to payment of all wages earned and unpaid prior to discharge immediately upon termination.

57.    Plaintiff was employed by Defendants from approximately October 2023 to November 2024.

58.    Plaintiff earned his bonus for the third quarter of 2024. The bonuses were due and payable in early November 2024.

59.    Defendants failed to pay Plaintiff all wages earned, including bonuses, prior to termination in accordance with Labor Code § 201.

60.    Defendants' failure to timely pay Plaintiff all wages earned prior to termination in accordance with Labor Code § 201 was willful. Defendants had the ability to pay the owed wages, but intentionally adopted policies or practices incompatible with the requirements of the California Labor Code and applicable Wage Orders, including Wage Order 5-2001. When

1 | Defendants failed to timely pay upon termination all wages earned prior to termination,

2 | Defendants knew what they were doing and intended to do what they did.

3 |       61.    Pursuant to Labor Code § 203, Plaintiff is entitled to waiting time penalty

4 | continuation wages, from the day Plaintiff earned and unpaid wages were due upon termination

5 | until paid, up to a maximum of 30 days.

6 |       62.    Pursuant to Labor Code §§ 218, 218.5, 218.6, and/or Civil Code § 3287(a),

7 | Plaintiff is entitled to recover the full amount of Plaintiff's unpaid wages, waiting time penalties,

8 | reasonable attorneys' fees, costs of suit, and pre-judgment interest on all due and unpaid wages.

9 |       63.    Wherefore, Plaintiff has been damaged as set forth above and requests relief as

10 | hereafter provided.

11 | ### FIFTH CAUSE OF ACTION

12 | ### DEFAMATION

13 | ### (Against all Defendants)

14 |       64.    Plaintiff incorporates all of the foregoing paragraphs of this complaint as if fully

15 | alleged herein.

16 |       65.    Plaintiff is informed and believes Defendants, by the herein-described acts,

17 | conspired to, and in fact, did negligently, recklessly, and intentionally caused excessive and

18 | unsolicited publications of defamation, of and concerning Plaintiff, to third persons.

19 |       66.    On or about November 4, 2024, Defendants, through Ms. Ibarra, published false

20 | and unprivileged statements about Plaintiff to Plaintiff and Ms. Angie Canterburry. Specifically,

21 | Defendants accused Plaintiff of engaging in fraudulent activity by falsifying records.

22 |       67.    Upon information and belief, Ms. Ibarra, Ms. Canterburry, and/or Ms. Porter

23 | published false and unprivileged statements alleging that Plaintiff had engaged in fraudulent

24 | activity to numerous individuals employed by Multiplan, and to individuals outside of Multiplan

25 | including providers, potential employers, and/or individuals at the EDD.

26 |

27 |

28 |

1    68.    The defamatory publications consisted of knowingly false and unprivileged

2    communication, tending to directly injure Plaintiff and Plaintiff's personal, business, and

3    professional reputation and/or ability to earn a living.

4    69.    Defendants did not have privilege and otherwise did not have any public purpose

5    to be served by Defendants' false and defamatory statements against Plaintiff.

6    70.    As a direct, legal, and proximate result of Defendants' conduct, as alleged above,

7    Plaintiff endured emotional distress, loss of wages and benefits, and significant reputational harm

8    in the community outside his employment of Multiplan, pursuant to which Plaintiff is entitled to

9    general and special damages according to proof.

10    71.    Plaintiff is informed and believes and thereupon alleges that Defendants' actions

11    were taken with malice, oppression, fraud, and/or willful and conscious disregard of Plaintiff's

12    rights. Plaintiff is therefore entitled to punitive damages in an amount to be determined at trial.

13    72.    Wherefore, Plaintiff has been damaged as set forth above and requests relief as

14    hereafter provided.

15    ## SIXTH CAUSE OF ACTION

16    ## VIOLATION OF LABOR CODE § 1198.5

17    ## FAILURE TO PROVIDE PERSONNEL FILE

18    ## (Against all Defendants)

19    73.    Plaintiff incorporates all of the foregoing paragraphs of this complaint as if fully

20    alleged herein.

21    74.    California Labor Code § 1198.5 provides in relevant part: "Every current and

22    former employee, or his or her representative, has the right to inspect and receive a copy of the

23    personnel records that the employer maintains relating to the employee's performance or to any

24    grievance concerning the employee. . . . The employer shall make the contents of those personnel

25    records available for inspection to the current or former employee, or his or her representative, at

26    reasonable intervals and at reasonable times, but not later than 30 calendar days from the date the

27    employer receives a written request, unless the current or former employee, or his or her

28

10

**COMPLAINT**

1  representative, and the employer agree in writing to a date beyond 30 calendar days to inspect

2  the records, and the agreed-upon date does not exceed 35 calendar days from the employer's

3  receipt of the written request."

4      75.    Defendants failed to timely provide Plaintiff copies of his personnel file, in

5  violation of Labor Code § 1198.5.

6      76.    Plaintiff did not agree, at any point, with Defendants to extend the 30-day

7  deadline to provide these personnel records.

8      77.    As a result of Defendants' unlawful conduct, Plaintiff has suffered damages in an

9  amount subject to proof.

10     78.    Plaintiff therefore seeks, *inter alia*, penalties and attorneys' fees, as applicable, for

11  Defendants' violation of this provision.

12                    **SEVENTH CAUSE OF ACTION**

13                  **VIOLATION OF LABOR CODE § 226**

14                **FAILURE TO PROVIDE PAYROLL RECORDS**

15                      **(Against all Defendants)**

16     79.    Plaintiff incorporates all of the foregoing paragraphs of this complaint as if fully

17  alleged herein.

18     80.    California Labor Code § 226(a) provides, in relevant part: "An employer,

19  semimonthly or at the time of each payment of wages, shall furnish to their employee, either as a

20  detachable part of the check, draft, or voucher paying the employee's wages, or separately if

21  wages are paid by personal check or cash, an accurate itemized statement in writing showing"

22  certain information related to the employee's wages.

23     81.    California Labor Code § 226(b) provides, in relevant part, that employers "shall

24  afford current and former employees the right to inspect or receive a copy of [payroll] records

25  pertaining to their employment, upon reasonable request to the employer." The statute further

26  provides that "[a]n employer who receives a written or oral request to inspect or receive a copy

27  of [payroll] records pursuant to subdivision (b) pertaining to a current or former employee shall

28

                                    11

1 │ comply with the request as soon as practicable, but no later than 21 calendar days from the date

2 │ of the request." *Id.* at (c).

3 │     82.    Defendants failed to timely provide Plaintiff copies of his payroll records, in

4 │ violation of Labor Code § 1198.5.

5 │     83.    As a result of Defendants' unlawful conduct, Plaintiff has suffered damages in an

6 │ amount subject to proof.

7 │     84.    Plaintiff therefore seeks, *inter alia*, penalties and attorneys' fees, as applicable, for

8 │ Defendants' violation of this provision.

9 │

10 │ **PRAYER FOR RELIEF**

11 │     Wherefore, Plaintiff prays for relief and judgment against Defendants as follows:

12 │     1.    For general damages according to proof, on each cause of action for which such

13 │ damages are available;

14 │     2.    For compensatory damages, according to proof on each cause of action for which

15 │ such damages are available;

16 │     3.    For damages for emotional distress and pain and suffering;

17 │     4.    That Plaintiff be awarded all available statutory remedies;

18 │     5.    For equitable relief to the extent available under law;

19 │     6.    For special damages, including without limitation punitive damages, according to

20 │ proof on each cause of action for which such damages are available;

21 │     7.    For pre- and post- judgment interest to the extent applicable by law;

22 │     8.    For reasonable attorneys' fees to the extent permitted by law, including without

23 │ limitation, under Code of Civil Procedure § 1021.5, Government Code § 12965(b), and any other

24 │ relevant provision under California law that provides for recovery of attorneys' fees;

25 │     9.    For costs of suit to the extent permissible including without limitation under Civil

26 │ Code § 1021.5, Government Code § 12965(b), and any other relevant provision under California

27 │ law that provides for recovery of costs;

28 │

10.    For civil penalties, statutory penalties, and other penalties as applicable; and

11.    For such other and further relief as the Court deems proper and just.

Dated: February 13, 2025                    FRANKLIN LAW P.C.


By: _____
Zak Franklin
Danica Li
Attorneys for James Brewer

/ / /

/ / /

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.


Dated: February 13, 2025                    FRANKLIN LAW P.C.


By: _____
Zak Franklin
Danica Li
Attorneys for James Brewer

# EXHIBIT "B"



# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Shawna Gasik123<br>MultiPlan<br>535 E Diehl Rd<br>Ste 150<br>Naperville, IL 60563-7782 |
| **Electronic copy provided to:** | Michelle Thompson<br>Kent Bartholomew<br>Veriozka Terry<br>Rebecca Kern<br>Marjorie Wilde |

| | |
|---|---|
| **Entity:** | MultiPlan, Inc.<br>Entity ID Number  3129680 |
| **Entity Served:** | Multiplan Inc. |
| **Title of Action:** | James Brewer vs. Multiplan Inc. |
| **Matter Name/ID:** | James Brewer vs. Multiplan Inc. (16941398) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Labor / Employment |
| **Court/Agency:** | Shasta County Superior Court, CA |
| **Case/Reference No:** | 207044 |
| **Jurisdiction Served:** | New York |
| **Date Served on CSC:** | 02/21/2025 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Franklin Law P.C.<br>424-258-5129 |

**Notes:**    Note: Only the first page of the Complaint was served.

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Multiplan Inc., and DOES 1 through 25

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
James Brewer, an individual



FILED

FEB 1 4 2025

SHASTA COUNTY SUPERIOR COURT
BY: C. WEST, DEPUTY CLERK

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Redding Main Courthouse<br><br>1515 Court Street Redding, CA 96001 | CASE NUMBER:<br>*(Número del Caso):*<br><br>2 0 7 0 4 4 |
| --- | --- |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Zak Franklin, Danica Li, Frankin Law PC, 100 Whilshire Blvd., Ste. 700, Santa Monica, CA 90401, 424-258-5129

| DATE: February 13, 2025<br>*(Fecha)* FEB 1 4 2025 | Clerk, by<br>*(Secretario)* C. WEST | , Deputy<br>*(Adjunto)* |
| --- | --- | --- |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

| [SEAL] | **NOTICE TO THE PERSON SERVED:** You are served<br>1. ☐ as an individual defendant.<br>2. ☐ as the person sued under the fictitious name of *(specify):*<br><br>3. ☒ on behalf of *(specify):* MULTIPLAN INC.<br>under: ☒ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)<br>☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)<br>☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)<br>☐ other *(specify):*<br>4. ☐ by personal delivery on *(date):* |
| --- | --- |

Page 1 of 1

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF SHASTA

Case Number: 25CV-0207044

### NOTICE OF: ALL PURPOSE ASSIGNMENT, MANDATORY SETTLEMENT CONFERENCE, AND TRIAL

# INSTRUCTIONS – READ IMMEDIATELY!

### ORDER OF ASSIGNMENT

This action is assigned to the Honorable Benjamin L Hanna for all purposes pursuant to Local Rule 3.02 of the Shasta County Superior Court.

### MANDATORY SETTLEMENT CONFERENCE DATE

A Mandatory Settlement Conference will be conducted in this action on Monday, November 17, 2025, at 1:30 pm in Department 63, located at 1515 Court Street, Redding, California 96001. All parties to this action are required to appear at the Settlement Conference.

The parties are ordered to comply with California Rules of Court, Rule 3.1380 relating to settlement conferences. Pursuant to Rule 3.1380(b), this court finds good cause is deemed to have been shown to excuse from attendance at settlement conference claims persons whose offices are more than 100 miles from the courthouse.

### TRIAL DATE

This matter is set for Trial on Tuesday, January 13, 2026, at 8:45 am in Department 63, located at 1515 Court Street, Redding, CA 96001.

### REQUIREMENT FOR SERVING THIS NOTICE

Plaintiff shall serve this notice on each defendant at the time of service of the complaint and on all intervenors and interpleaders within 10 days of service on plaintiff of complaints in intervention or interpleader. All cross-complainants shall serve this notice on each cross-defendant at the time of service of the cross-complaint.

IF YOU ARE A DEFENDANT OR CROSS-DEFENDANT, YOU HAVE BEEN SERVED WITH OTHER DOCUMENTS ALONG WITH THIS NOTICE. UNDER THE LAW, THOSE OTHER DOCUMENTS REQUIRE YOU TO TAKE ACTION PROMPTLY TO PRESERVE YOUR RIGHTS. PLEASE REVIEW THOSE MATERIALS IMMEDIATELY. THE REQUIREMENTS SET FORTH IN THIS NOTICE AND THE SETTLEMENT CONFERENCE AND TRIAL DATE SCHEDULED IN THIS NOTICE ARE SEPARATE AND ARE IN ADDITION TO THOSE CONTAINED IN THE OTHER DOCUMENTS WHICH YOU HAVE RECEIVED.

Dated: January 1, 2025

TAMARA L. WOOD, Presiding Judge

I CERTIFY THAT A COPY OF THIS DOCUMENT WAS PROVIDED TO THE PLAINTIFF ON FEBRUARY 14, 2025.

BY: C. West , DEPUTY CLERK

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SHASTA
## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. Private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. You can read more information about these ADR processes and watch videos that demonstrate them at http://www.courts.ca.gov/programs-adr.htm . If the parties agree to an ADR program, the parties may file the agreement with the court for the purpose of assisting the court in determining how to proceed at the case management conference.

### Potential Advantages and Disadvantages

ADR may have a variety of advantages and disadvantages over a trial, depending on the type of ADR process used and the particular case:

**Potential Advantages**
- Saves time
- Saves money
- Gives parties more control over the dispute resolution process and outcome
- Preserves or improves relationships.

**Potential Disadvantages**
- May take more time and money if ADR does not resolve the dispute
- Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable.

### Most Common Types of ADR

**Mediation** – A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners.

**Settlement Conferences** – A judge helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Neutral Evaluation** – The parties briefly and informally present their facts and arguments to a neutral person called an "evaluator", who is often an expert in the subject matter of the dispute. The evaluator does not decide the outcome of the dispute, but helps the parties to do so by giving them a non-binding opinion about the strengths, weaknesses, and likely outcome of their case. Depending on the neutral evaluation program and the parties' wishes, the evaluator may then help the parties try to negotiate a settlement. Neutral evaluation may be appropriate if the parties want a neutral person's opinion about how the case might be resolved, if the primary dispute is the amount of damages, or if there are technical issues that the parties would like a neutral expert to help resolve.

**Arbitration** – The parties present evidence and arguments to a neutral person called an "arbitrator" who then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to *binding arbitration*, they waive their right to a trial and agree to accept the arbitrator's decision as final. With *nonbinding arbitration*, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time and expense of a trial, or want an expert in the subject matter of the dispute to make the decision.

## Selecting an ADR Program and Neutral

Selecting an ADR program and neutral are important decisions. Be sure to learn about the rules of any program and the qualifications of any neutral you are considering, and about their fees.

## Shasta County Superior Court ADR Programs

When a civil case is set for trial the judge also will set a settlement conference date approximately six weeks before the trial date. The judge assigned to the case will assist the parties in attempting to arrive at a negotiated resolution.

Shasta County Superior Court does not offer mediation, neutral evaluations, or arbitrations.

**Private ADR Providers** – To find a private ADR program or neutral evaluator, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

## Legal Representation and Advice

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or the Shasta-Trinity Counties Bar Association may assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California Courts website at http://courts.ca.gov/selfhelp.htm .

1  Zak Franklin (SBN 302042)
   Danica Li (SBN 308650)
2  **FRANKLIN LAW P.C.**
   100 Wilshire Blvd., Ste. 700
3  Santa Monica, California 90401
   Telephone: (424) 258-5129
4  zak@franklinlawpc.com
   danica@franklinlawpc.com
5
   Attorneys for Plaintiff
6  James Brewer

7

8                    **SUPERIOR COURT OF CALIFORNIA**

9                         **COUNTY OF SHASTA**

   James Brewer, an individual;                    Case No.: **207044**
10
                                                    **COMPLAINT FOR DAMAGES**
11
                                                    1.  **Wrongful Termination in Violation of**
12            Plaintiff,                                **Public Policy**
                                                    2.  **Violation of Labor Code § 1102.5(b):**
13       vs.                                            **Retaliation**
                                                    3.  **Failure to Timely Pay Earned Bonuses**
14                                                      **In Violation of Labor Code § 204**
   Multiplan Inc.; and Does 1 through 25,          4.  **Failure to Timely Pay Wages In**
15                                                     **Violation of Labor Code §§ 201, 202**
                                                    5.  **Defamation**
16            Defendants.                           6.  **Failure to Provide Personnel Records**
                                                    7.  **Failure to Provide Payroll Records**
17
                                                    **DEMAND FOR JURY TRIAL**
18

19

20

21

22

23

24

25

26

27

28

─────────────────────────────────────────────
                        **COMPLAINT**

**CM-010**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Zak Franklin (SBN 302042); Danica Li (SBN 308650)<br>Franklin Law P.C.; 100 Wilshire Blvd., Ste. 700, Santa Monica, CA 90401<br><br>TELEPHONE NO.: 424-258-5129    FAX NO.:<br>EMAIL ADDRESS: zak@franklinlawpc.com / danica@franklinlawpc.com<br>ATTORNEY FOR *(Name):* Plaintiff, James Brewer | FOR COURT USE ONLY<br><br>FILED<br>FEB 14 2025<br>SHASTA COUNTY SUPERIOR COURT<br>BY: C. WEST, DEPUTY CLERK |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SHASTA
STREET ADDRESS: 1515 Court Street
MAILING ADDRESS: 1515 Court Street
CITY AND ZIP CODE: Redding, CA 96001
BRANCH NAME: Redding Main Courthouse

CASE NAME:
James Brewer v. Multiplan Inc., and Does 1 through 25

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER:<br>207044 |
|---|---|---|---|---|
| [x] Unlimited<br>(Amount<br>demanded<br>exceeds $35,000) | [ ] Limited<br>(Amount<br>demanded is<br>$35,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [x] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [x] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4. Number of causes of action *(specify):* 7 (Seven)
5. This case [ ] is  [x] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: February 13, 2025

Danica Li, Esq.
_____
(TYPE OR PRINT NAME)                           ►        _____
                                                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

# EXHIBIT "C"

Judith Cregan, Bar No. 208779
jcregan@littler.com
LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
Telephone:    916.830.7200
Facsimile:    916.561.0828

Attorneys for Defendant
MULTIPLAN, INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SHASTA

| | |
|---|---|
| JAMES BREWER, an individual,<br><br>        Plaintiff,<br><br>    v.<br><br>MULTIPLAN INC., and DOES 1 through 25,<br><br>        Defendants. | Case No. 25CV-0207044<br><br>**DEFENDANT MULTIPLAN, INC.'S ANSWER TO PLAINTIFF JAMES BREWER'S COMPLAINT**<br><br>ASSIGNED FOR ALL PURPOSES TO HON. BENJAMIN L. HANNA DEPT. 63<br><br>Dept.:        63<br><br>Trial Date:          January 13, 2026<br>Complaint Filed:    February 14, 2025 |

1    Defendant MULTIPLAN, INC. ("Defendant") hereby answers JAMES BREWER's ("Plaintiff")

2  complaint for damages ("Complaint") as follows:

3                                   **GENERAL DENIAL**

4         Pursuant to the provisions of California Code of Civil Procedure section 431.30, Defendant

5  generally denies each and every allegation contained in Plaintiff's Complaint, and further denies that

6  Plaintiff is entitled to penalties, attorneys' fees, costs of suit, general damages, special damages,

7  compensatory damages, interest, injunctive relief, or any other relief of any kind whatsoever.

8                          **AFFIRMATIVE AND OTHER DEFENSES**

9         Defendant asserts the following affirmative and other defenses, which it has designated,

10 collectively, as "affirmative defenses." Defendant's designation of its defenses as "affirmative" is not

11 intended to alter Plaintiff's burden of proof with regard to any element of his causes of action. Moreover,

12 Defendant does not presently know all the factors concerning Plaintiff's conduct sufficient to state all

13 affirmative defenses at this time.

14                             **FIRST AFFIRMATIVE DEFENSE**

15                             **(Failure to State a Cause of Action)**

16        1.   As a separate and distinct affirmative defense, Defendant alleges that the Complaint and each

17 cause of action set forth therein, or some of them, fail to state facts sufficient to constitute a cause of action

18 upon which relief may be granted.

19                            **SECOND AFFIRMATIVE DEFENSE**

20                                         **(Waiver)**

21        2.   As a separate and distinct affirmative defense, Defendant alleges that the Complaint and each

22 cause of action set forth therein, or some of them, may be barred, in whole or in part, by the equitable doctrine

23 of waiver. During the relevant time period, Defendant had multiple legally compliant policies and

24 procedures in place prohibiting retaliation, and/or statutory violations, among others. These policies were

25 generally distributed to employees, including Plaintiff. Defendant's employees, including Plaintiff,

26 generally acknowledged receipt of these policies, and agreed to comply with the same. Defendant relied

27 upon Plaintiff's agreement to comply with these policies, and Plaintiff subsequently violated the same.

28 / / /

LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
916.830.7200

DEFENDANT MULTIPLAN, INC.'S ANSWER TO PLAINTIFF JAMES BREWER'S COMPLAINT

Defendant hereby reserves the right to amend/supplement this Answer upon further investigation and discovery of facts supporting this defense.

### THIRD AFFIRMATIVE DEFENSE

#### (Estoppel)

3.   As a separate and distinct affirmative defense, Defendant alleges that the Complaint and each cause of action set forth therein, or some of them, may be barred, in whole or in part, by the equitable doctrine of estoppel. During the relevant time period, Defendant had multiple legally compliant policies and procedures in place prohibiting retaliation and/or statutory violations, among others. These policies were generally distributed to employees, including Plaintiff. Defendant's employees, including Plaintiff, generally acknowledged receipt of these policies, and agreed to comply with the same. Defendant relied upon Plaintiff's agreement to comply with these policies, and Plaintiff subsequently violated the same. Defendant hereby reserves the right to amend/supplement this Answer upon further investigation and discovery of facts supporting this defense.

### FOURTH AFFIRMATIVE DEFENSE

#### (Laches)

4.   As a separate and distinct affirmative defense, Defendant alleges that the Complaint and each cause of action set forth therein, or some of them, may be barred, in whole or in part, by the equitable doctrine of laches. During the relevant time period, Defendant had multiple legally compliant policies and procedures in place prohibiting retaliation and/or statutory violations, among others. These policies were generally distributed to employees, including Plaintiff. Defendant's employees, including Plaintiff, generally acknowledged receipt of these policies, and agreed to comply with the same. Defendant relied upon Plaintiff's agreement to comply with these policies, and Plaintiff subsequently violated the same. Defendant hereby reserves the right to amend/supplement this Answer upon further investigation and discovery of facts supporting this defense.

### FIFTH AFFIRMATIVE DEFENSE

#### (Unclean Hands)

5.   As a separate and distinct affirmative defense, Defendant alleges that the Complaint and each cause of action set forth therein, or some of them, may be barred, in whole or in part, by the equitable doctrine

3.

of unclean hands. During the relevant time period, Defendant had multiple legally compliant policies and procedures in place prohibiting fraud and waste. These policies were generally distributed to employees, including Plaintiff. Defendant's employees, including Plaintiff, generally acknowledged receipt of these policies, and agreed to comply with the same. Defendant relied upon Plaintiff's agreement to comply with these policies, and Plaintiff subsequently violated the same by committing fraud and waste. Defendant hereby reserves the right to amend/supplement this Answer upon further investigation and discovery of facts supporting this defense.

## SIXTH AFFIRMATIVE DEFENSE

### (Statutes of Limitation)

6.   As a separate and distinct affirmative defense, Defendant alleges that the Complaint and each cause of action set forth therein, or some of them, may be barred by the applicable statutes of limitation including, without limitation, those set forth in California Government Code sections 12960(d) and 12965(b);; and California Code of Civil Procedure sections 337, 338, 339, 340, and/or 343.

## SEVENTH AFFIRMATIVE DEFENSE

### (Failure to Exhaust Administrative Remedies)

7.   As a separate and distinct defense, Defendant alleges that the Complaint and each cause of action set forth therein, or some of them, are barred to the extent Plaintiff failed to exhaust his administrative remedies with the California Civil Rights Division ("CRD") formerly the California Department of Fair Employment and Housing ("DFEH") and/or the Equal Employment Opportunity Commission ("EEOC"). Assuming *arguendo* that Plaintiff did attempt to exhaust his administrative remedies with the CRD and/or the EEOC, the causes of action asserted in the Complaint exceed the scope of any potential Charges filed with the CRD and/or EEOC.

## EIGHTH AFFIRMATIVE DEFENSE

### (Legitimate Business Reasons for Employment Decisions)

8.   As a separate and distinct affirmative defense, Defendant alleges that the Complaint and each cause of action set forth therein, or some of them, are barred to the extent the employment decisions about which Plaintiff complains were based upon legitimate non-retaliatory, and non-harassing reasons.

/ / /

LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
916.830.7200

DEFENDANT MULTIPLAN, INC.'S ANSWER TO PLAINTIFF JAMES BREWER'S COMPLAINT

**NINTH AFFIRMATIVE DEFENSE**

**(Business Necessity)**

9.    As a separate and distinct affirmative defense, Defendant alleges (without admitting that Defendant engaged in any of the acts or omissions alleged in Plaintiff's Complaint) that any such acts or omissions were undertaken for business necessity and/or for lawful business reasons.

**TENTH AFFIRMATIVE DEFENSE**

**(Defendant Acted in Good Faith and with Good Cause)**

10.    As a separate and distinct affirmative defense, Defendant alleges that the Complaint and each cause of action set forth therein, or some of them, are barred because good cause existed for each and every action taken by Defendant with respect to Plaintiff's employment and Defendant acted reasonably and in good faith, at all times, based upon all relevant facts and circumstances known by Defendant at the time and because there exists a good faith dispute as to whether further compensation is due and/or Defendant has reasonable grounds for believing that their wage payment practices complied with applicable laws and that any act or omission was not a violation of the Labor Code.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Same Decision)**

11.    As a separate and distinct affirmative defense, Defendant alleges that the Complaint and each purported cause of action therein, are barred, in whole or in part, because, without admitting that any unlawful or wrongful acts took place, if any unlawful motive existed in connection with any employment decision involving Plaintiff, which Defendant denies, such employment decision would have been the same even without any such unlawful or retaliatory motive.

**TWELFTH AFFIRMATIVE DEFENSE**

**(Failure to Exhaust Internal Remedies)**

12.    As a separate and distinct affirmative defense, Defendant alleges that the Complaint and each cause of action set forth therein, or some of them, are barred to the extent Plaintiff failed to exhaust appropriate internal remedies. Suitable harassment, and retaliation policies were in effect at all times material to the allegations in Plaintiff's Complaint, and Plaintiff's claims are barred to the extent he unreasonably failed to take advantage of such policies and to otherwise avoid his alleged harm.

LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
916.830.7200

DEFENDANT MULTIPLAN, INC.'S ANSWER TO PLAINTIFF JAMES BREWER'S COMPLAINT

### THIRTEENTH AFFIRMATIVE DEFENSE

#### (After-Acquired Evidence)

13.  As a separate and distinct affirmative defense, Defendant alleges that to the extent Defendant acquires any evidence of wrongdoing by Plaintiff during the course of this litigation that would have materially affected the terms and conditions of Plaintiff's employment or would have resulted in Plaintiff being demoted, disciplined, and/or terminated, such after-acquired evidence shall bar Plaintiff's claims on liability or damages and shall reduce such claims as provided by law.

### FOURTEENTH AFFIRMATIVE DEFENSE

#### (Plaintiff's Breach of Duties)

14.  As a separate and distinct affirmative defense, Defendant is informed and believes that further investigation and discovery will reveal, and on that basis alleges, that Plaintiff's claims are barred by his own breach of the duties owed to his employer pursuant to the California Labor Code, including but not limited to California Labor Code sections 2853 to 2859.

### FIFTEENTH AFFIRMATIVE DEFENSE

#### (At-Will Employment)

15.  As a separate and distinct affirmative defense, Defendant alleges that the Complaint and each cause of action set forth therein, or some of them may be barred because Plaintiff was an at-will employee.

### SIXTEENTH AFFIRMATIVE DEFENSE

#### (Offset)

16.  As a separate and distinct affirmative defense, Defendant alleges that any recovery to which Plaintiff might otherwise be entitled must be offset by any unemployment benefits and/or other monies and/or benefits Plaintiff has received or will receive.

### SEVENTEENTH AFFIRMATIVE DEFENSE

#### (Failure to Mitigate Damages)

17.  As a separate and distinct affirmative defense, Defendant alleges that Plaintiff is barred from obtaining any recovery against Defendant to the extent he failed to mitigate his alleged damages, if any, or, alternatively, any damages or other relief awarded to Plaintiff must be reduced or limited to the extent of such failure to mitigate.

DEFENDANT MULTIPLAN, INC.'S ANSWER TO PLAINTIFF JAMES BREWER'S COMPLAINT

1

## EIGHTEENTH AFFIRMATIVE DEFENSE

2

### (Speculative Damages)

3    18. As a separate and distinct affirmative defense, Defendant alleges Plaintiff's claims for

4    damages are precluded to the extent that such damages are speculative.

5

## NINETEENTH AFFIRMATIVE DEFENSE

6

### (Punitive Damages Unconstitutional)

7    19. As a separate and distinct affirmative defense, Defendant alleges that Plaintiff is not entitled

8    to recover punitive damages because the imposition of such damages violates the United States and California

9    Constitutions, in that: (1) such damages are so punitive in purpose and effect as to constitute a criminal penalty,

10   entitling Defendant to rights to be given to defendant in criminal proceedings under the United States and

11   California Constitutions; (2) such damages constitute an impermissible restriction on speech and a violation

12   of the First Amendment of the United States Constitution; (3) the imposition of such damages would violate

13   Defendant's right to due process and/or equal protection under the law, under the United States and California

14   Constitutions; and/or (4) the California punitive damages statute is unconstitutional in that it imposes an undue

15   burden on interstate commerce.

16

## TWENTIETH AFFIRMATIVE DEFENSE

17

### (No Knowledge Justifying Punitive Damages)

18   20. As a separate and distinct affirmative defense, Defendant alleges that without admitting to any

19   of the acts, conduct or statements attributed to it by Plaintiff's Complaint, Plaintiff's claims for punitive

20   damages are barred to the extent the acts, conduct, or statements contained in Plaintiff's Complaint were not

21   taken with the advance knowledge, conscious disregard, authorization, ratification, or act of oppression, fraud,

22   or malice on the part of an officer, director, or managing agent of the corporation.

23

## TWENTY-FIRST AFFIRMATIVE DEFENSE

24

### (Performance)

25   21. As a separate and distinct affirmative defense, Defendant alleges (without admitting that it

26   engaged in any of the acts or omissions alleged in Plaintiff's Complaint) that its conduct towards Plaintiff was

27   fully justified based upon its judgment of differences in individual position performance, qualifications, skill,

28   effort, responsibility, merit, or other bona fide occupational qualifications.

LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
916.830.7200

DEFENDANT MULTIPLAN, INC.'S ANSWER TO PLAINTIFF JAMES BREWER'S COMPLAINT

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Workers' Compensations Act)

22. As a separate and distinct affirmative defense, Defendant alleges that Plaintiff's exclusive remedy for any alleged physical, mental and/or emotional injuries, including claims for emotional distress injury, to the extent such injuries are alleged to have arisen out of the parties' employment relationship, is under California Workers' Compensation Act, Labor Code section 3600, *et seq.*, and this Court is divested of jurisdiction inasmuch as an employer/employee relationship existed subject to workers' compensation coverage, Defendant is informed, and so believes, that Defendant provided workers' compensation insurance at no cost to Plaintiff, and Plaintiff's conduct was within the course and scope of his employment, and the alleged injury, if any injury exists, was proximately caused by the employment.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Avoidable Consequences)

23. As a separate and distinct affirmative defense, Defendant alleges that Plaintiff's Complaint and damages, if any, are barred either in whole or in part by the doctrine of avoidable consequences.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Outside Scope)

24. As a separate and distinct affirmative defense, Defendant alleges that any unlawful or wrongful acts, if any, taken by Defendant's officers, directors, managing agents, and/or employees were outside the course and scope of their employment and authority, and such acts, if any, were not authorized, ratified, or condoned by Defendant, and Defendant did not know and/or should not have known of such conduct.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (Managerial Privilege)

25. As a separate and distinct affirmative defense, Defendant alleges that the Complaint and each cause of action set forth therein cannot be maintained against Defendant because Defendant's alleged act(s) or omission(s) alleged in the Complaint were protected by the managerial privilege as all actions taken with respect to Plaintiff's employment were undertaken and exercised with proper managerial discretion in good faith, and for legitimate, lawful reasons.

LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
916.830.7200

DEFENDANT MULTIPLAN, INC.'S ANSWER TO PLAINTIFF JAMES BREWER'S COMPLAINT

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (No Protected Activity)

26. As a separate and distinct affirmative defense, Defendant alleges that Plaintiff's Complaint, and each purported cause of action alleged therein, are barred, including but not limited to Plaintiff's claim for retaliation, because Plaintiff did not engage in any legally protected activity.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

### (No Reasonable Cause to Believe)

27. As a separate and distinct affirmative defense, Defendant alleges that Plaintiff's Complaint, and each purported cause of action alleged therein, are barred, including but not limited to Plaintiff's claim for retaliation, because Plaintiff had no reasonable cause to believe that Defendant or any of its employees were violating any sate or federal statute or were in violation or non-compliance with a local, state, or federal rule or regulation.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

### (Punitive Damages – Failure to State Claim with Specificity)

28. As a separate and distinct affirmative defense, Defendant alleges that Plaintiff's claims for punitive damages are precluded to the extent that such damages are speculative and/or because Plaintiff fails to plead facts sufficient to support the recovery of punitive damages.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

### (Punitive Damages Unavailable)

29. As a separate and distinct affirmative defense, Defendant alleges that Plaintiff is precluded from recovering punitive damages from Defendant, either in whole or in part, under the applicable provisions of California Civil Code section 3294, or such other statutes of similar effect that may be applicable.

## THIRTIETH AFFIRMATIVE DEFENSE

### (No Malice)

30. As a separate and distinct affirmative defense, Defendant alleges that assuming *arguendo*, any conduct alleged by Plaintiff occurred, such conduct was not in reckless disregard of Plaintiff's rights,

/ / /

LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
916.830.7200

1  nor was it the result of purposeful, knowing, bad faith, intentional, willful, fraudulent, deliberate, callous,
2  oppressive or malicious conduct by Defendant.

### THIRTY-FIRST AFFIRMATIVE DEFENSE
### (No Entitlement to Prejudgment Interest)

31. As a separate and distinct affirmative defense, Defendant alleges that Plaintiff is not entitled to an award of prejudgment interest if he prevails on any or all of his purported claims.

### THIRTY-SECOND AFFIRMATIVE DEFENSE
### (Plaintiff's Actions)

32. As a separate and distinct affirmative defense, Defendant alleges that Plaintiff's claims are barred to the extent that his damages were caused by his fraudulent acts and/or omissions or violation of Defendant's business policies.

### THIRTY-THIRD AFFIRMATIVE DEFENSE
### (Other Causes for Plaintiff's Emotional Distress)

33. As a separate and distinct affirmative defense, Defendant alleges that if Plaintiff has suffered any emotional distress (which Defendant denies), Plaintiff's recovery is barred to the extent that his emotional distress was proximately caused by factors other than his employment and/or the actions of Defendant or anyone acting on Defendant's behalf.

### THIRTY-FOURTH AFFIRMATIVE DEFENSE
### (Emotional Distress – No Intent)

34. As a separate and distinct affirmative defense, Defendant alleges that if Plaintiff suffered any emotional distress, which Defendant denies that Plaintiff suffered any such distress, it was not the intent of Defendant, or any person acting on Defendant's behalf, to inflict such emotional distress on Plaintiff.

### THIRTY-FIFTH AFFIRMATIVE DEFENSE
### (No Proximate Cause)

35. As a separate and distinct affirmative defense, Defendant alleges Plaintiff's alleged injuries were not proximately caused by any unlawful policy, custom, practice and/or procedure promulgated and/or tolerated by Defendant.

10.

## THIRTY-SIXTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

36.  As a separate and distinct affirmative defense, Defendant alleges the Complaint is barred by the equitable doctrine of unjust enrichment.

## THIRTY-SEVENTH AFFIRMATIVE DEFENSE

### (Accord and Satisfaction/ Full Performance)

37.  Defendant alleges the Complaint fails because, without admitting the existence of any duties or obligations as alleged in the Complaint, Defendant has fully performed, satisfied, and/or discharged any obligations allegedly owed to Plaintiff for any amount to which he was entitled.

## THIRTY-EIGHTH AFFIRMATIVE DEFENSE

### (*Bona Fide* Dispute)

38.  As a separate and distinct affirmative defense, Defendant is informed and believes, and on that basis alleges, the Complaint is barred because there exists a *bona fide* dispute as to whether further compensation is actually due to Plaintiff and, if so, as to the amount of such further compensation.

## THIRTY-NINTH AFFIRMATIVE DEFENSE

### (No Willful or Intentional Failure to Pay)

39.  As a separate and distinct affirmative defense, Defendant is informed and believes and on that basis alleges the Complaint, and the allegations regarding waiting time penalties, is barred because Defendant acted in good faith, Defendant did not willfully or intentionally fail to pay any such additional compensation to Plaintiff, and that a good faith dispute exists over whether wages are owed.

## FORTIETH AFFIRMATIVE DEFENSE

### (Truth)

40. As a separate and distinct affirmative defense, Defendant alleges that Plaintiff's Complaint, and each purported cause of action alleged therein, are barred, including but not limited to Plaintiff's claim for defamation, because to the extent that Defendant made any statements about Plaintiff to anyone outside of Defendant, those statements were true.

/ / /

/ / /

LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
916.830.7200

DEFENDANT MULTIPLAN, INC.'S ANSWER TO PLAINTIFF JAMES BREWER'S COMPLAINT

## FORTY-FIRST AFFIRMATIVE DEFENSE

### (Privilege)

41. As a separate and distinct affirmative defense, Defendant alleges that Plaintiff's Complaint, and each purported cause of action alleged therein, are barred, including but not limited to Plaintiff's claim for defamation, because to the extent that Defendant made any statements about Plaintiff to anyone outside of Defendant, those statements were privileged statements.

## FORTY-SECOND AFFIRMATIVE DEFENSE

### (No Malice)

42. As a separate and distinct affirmative defense, Defendant alleges that Plaintiff's Complaint, and each purported cause of action alleged therein, are barred, including but not limited to Plaintiff's claim for defamation, because to the extent that Defendant made any statements about Plaintiff to anyone outside of Defendant, those statements were made without malice.

## FORTY-THIRD AFFIRMATIVE DEFENSE

### (Opinion)

43. As a separate and distinct affirmative defense, Defendant alleges that Plaintiff's Complaint, and each purported cause of action alleged therein, are barred, including but not limited to Plaintiff's claim for defamation, because to the extent that Defendant made any statements about Plaintiff to anyone outside of Defendant, those statements were Defendant's opinion only.

## FORTY-FOURTH AFFIRMATIVE DEFENSE

### (No Harm)

44. As a separate and distinct affirmative defense, Defendant alleges that Plaintiff's Complaint, and each purported cause of action alleged therein, are barred, including but not limited to Plaintiff's claim for defamation, because to the extent that Defendant made any statements about Plaintiff to anyone outside of Defendant, they did not harm Plaintiff.

## RESERVATION OF ADDITIONAL DEFENSES

Defendant does not presently know all of the facts concerning the conduct of Plaintiff and Plaintiff's claims sufficient to state all affirmative defenses at this time. Accordingly, Defendant expressly

/ / /

LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
916.830.7200

DEFENDANT MULTIPLAN, INC.'S ANSWER TO PLAINTIFF JAMES BREWER'S COMPLAINT

1  reserves the right to amend this Answer should Defendant later discover facts demonstrating the existence

2  of additional affirmative defenses.

3  **<u>PRAYER FOR RELIEF</u>**

4        WHEREFORE, Defendant prays for relief as follows:

5        1.      That Plaintiff takes nothing by way of his Complaint in relation to Defendant;

6        2.      That judgment be entered in Defendant's favor and against Plaintiff on all causes of action;

7        3.      That the Complaint be dismissed with prejudice and that judgment be entered against

8  Plaintiff and in favor of Defendant on each claim;

9        4.      That Defendant be awarded costs of suit and attorneys' fees incurred herein as allowed by

10  law; and

11        5.      That Defendant be awarded for such further relief as the Court deems just and proper.

12

13  Dated:  March 21, 2025                  LITTLER MENDELSON, P.C.

14

15                                      _____

16                                      Judith Cregan

17                                      Attorneys for Defendant
                                    MULTIPLAN, INC.

18  4911-7010-4619 / 066692.1021

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
916.830.7200

DEFENDANT MULTIPLAN, INC.'S ANSWER TO PLAINTIFF JAMES BREWER'S COMPLAINT

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 5200 North Palm Avenue, Suite 302, Fresno, California 93704.2225. On March 21, 2025, I served the within document(s):

**DEFENDANT MULTIPLAN, INC.'S ANSWER TO PLAINTIFF**

**JAMES BREWER'S COMPLAINT**

☐    By facsimile transmission at or about _____ on that date. This document was transmitted by using a facsimile machine that complies with California Rules of Court Rule 2003(3), telephone number _____. The transmission was reported as complete and without error. A copy of the transmission report, properly issued by the transmitting machine, is attached. The names and facsimile numbers of the person(s) served are as set forth below.

☐    By placing a true copy of the document(s) listed above for collection and mailing following the firm's ordinary business practice in a sealed envelope with postage thereon fully prepaid for deposit in the United States mail at Fresno, California addressed as set forth below.

☐    By depositing a true copy of the same enclosed in a sealed envelope, with delivery fees provided for, in an overnight delivery service pick up box or office designated for overnight delivery and addressed as set forth below.

☐    By personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐    By messenger service. I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a professional messenger service for service. (A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)

LITTLER
MENDELSON, P.C.
5200 North
Palm Avenue
Suite 302
Fresno,
California
93704.2225
559.244.7500

4928-0892-3688.1 / 066692.1021

1

2    ☒    By Electronic Service. Based on a court order or an agreement of the parties to accept

3    electronic service, I caused the documents to be sent to the persons at the electronic service

4    addresses listed below.

5    Zak Franklin, Esq.
     Danica Li, Esq.
6    FRANKLIN LAW P.C.
     100 Wilshire Blvd., Suite 700
7    Santa Monica, California 90401
     Tel: 424.258.5129
8    zak@franklinlawpc.com
     danica@franklinlawpc.com
9

10    I am readily familiar with the firm's practice of collection and processing correspondence

11   for mailing and for shipping via overnight delivery service. Under that practice it would be deposited with

12   the U.S. Postal Service or if an overnight delivery service shipment, deposited in an overnight delivery

13   service pick-up box or office on the same day with postage or fees thereon fully prepaid in the ordinary

14   course of business.

15    I declare under penalty of perjury under the laws of the State of California that the

16   foregoing is true and correct, and this Declaration was executed at Fresno, California on March 21, 2025.

17

18   _Jennifer A. Drudge_
     Jennifer A. Drudge

19

20

21

22

23

24

25

26

27

28

LITTLER
MENDELSON,
P.C.
5200 North
Palm Avenue
Suite 302
Fresno,
California
93704.2225
559.244.7500

2

PROOF OF SERVICE

4928-0892-3688.1 / 066692.1021

# EXHIBIT D

# TAB A

## Plaintiff: Fired after complaining of misclassification

**Type:**                Verdict-Plaintiff

**Amount:**              $3,000,000

**State:**               California

**Venue:**               Riverside County

**Court:**               Superior Court of Riverside County, Riverside, CA

**Injury Type(s):**      • *mental/psychological* - emotional distress

**Case Type:**           • *Employment* - Retaliation; California Labor Code
                         • *Intentional Torts* - Intentional Infliction of Emotional Distress

**Case Name:**           Camille Almada v. HHCare LLC and Jacqueline Hawk, No. CVPS2103064

**Date:**                October 02, 2023

**Plaintiff(s):**        • Camille Almada, (Female, 61 Years)

**Plaintiff
Attorney(s):**           • Jared M. Irmas; Irmas Law APC; Woodland Hills CA for Camille Almada
                         • Justin G. Silverman; Law Offices of Justin Silverman, APC; Sherman Oaks CA for
                           Camille Almada

**Defendant(s):**        • HHCare LLC
                         • Jacqueline Hawk

**Defense
Attorney(s):**           • Timothy Brock McClellan; Timothy Brock McClellan; Palm Desert, CA for
                           HHCare LLC, Jacqueline Hawk

**Facts:** Since Feb. 22, 2019, plaintiff Camille Almada, 61, worked for Heaven Heights, a company owned by HHCare LLC, serving as a caregiver for elderly clients in the Palm Springs area. Subsequently, in 2021, after two years of performing this work, Almada complained to Heaven Heights' owner, Jacqueline Hawk, that she was being misclassified as an independent contractor and that she was not properly classified as an employee. Following her complaint, Almada says that on Feb. 2, 2021, Hawk informed her that she could not return to work for her elderly client.

Almada sued HHCare LLC and Hawk, claiming violations of California's Labor Code, as well as retaliation and intentional infliction of emotional distress.

Almada's counsel contended that she was fired in retaliation for complaining about being misclassified. Almada's counsel alleged that HHCare LLC was the alter ego of its owner, Hawk, and that Almada's termination caused her intentional infliction of emotional distress.

HHCare LLC contended it was an employment agency/referral agency and it therefore did not employ Almada, and that it did not terminate her from any position of employment.

**Injury:** Almada worked for the company for two years. She claims she was terminated on Feb. 2, 2021. Almada's counsel noted that text messages from Hawk to Almada terminating her were aggressive in nature and caused Almada emotional distress. Almada claims she suffered emotional distress when she texted Hawk that she did not want to lose her job. Almada claims she suffered humiliation and terror when her vehicle was repossessed and her electricity was shut off due to financial distress caused by the termination. She did not state she needed counseling and she did not seek counseling or medical attention for her emotional distress. Almada sought past and future emotional distress damages from both HHCare LLC and Hawk, and Almada also sought punitive damages each from both HHCare LLC and Hawk.

**Result:** The jury found that the company was an alter ego of Hawk and that Hawk and the company misclassified Almada. The jury awarded Almada a total of $3 million against the company and Hawk.

Camille Almada

$ 500,000 future emotional distress against Hawk

$ 500,000 punitive damages against Hawk

$ 500,000 past emotional distress against HHCare LLC dba Heaven Heights

$ 500,000 past emotional distress against Hawk

$ 500,000 punitive damages against HHCare LLC dba Heaven Heights

$ 500,000 future emotional distress against HHCare LLC dba Heaven Heights

**$ 3,000,000 Plaintiff's Total Award**

**Trial Information:**

**Judge:**          Kira L. Klatchko

**Trial Length:**    3 weeks

**Trial
Deliberations:**     4 hours

**Editor's
Comment:**           This report includes information that was provided by plaintiff's counsel. Defense counsel
                     did not respond to the reporter's phone calls.

**Writer**           Priya Idiculla

# **TAB B**

## Nursing home terminated employee in retaliation for ongoing lawsuit: plaintiff

**Type:**              Verdict-Plaintiff

**Amount:**            $11,183,000

**State:**             California

**Venue:**             Riverside County

**Court:**             Superior Court of Riverside County, Riverside, CA

**Case Type:**
- *Employment* - Retaliation; Whistleblower; Wages and Hours; Wrongful Termination
- *Intentional Torts* - Defamation

**Case Name:**         Kathleen Armstrong v. Lifecare Centers of America Inc., No. RIC1902845

**Date:**              December 15, 2023

**Plaintiff(s):**
- Kathleen Armstrong, (Female, 58 Years)

**Plaintiff Attorney(s):**
- Lawrance A. Bohm; Bohm Law Group, Inc.; Sacramento CA for Kathleen Armstrong
- Kelsey K. Ciarimboli; Bohm Law Group, Inc.; San Diego CA for Kathleen Armstrong
- Mark H. Wagner; Wagner Legal Group, P.C.; Santa Monica CA for Kathleen Armstrong

**Defendant(s):**
- Lifecare Centers of America Inc.

**Defense Attorney(s):**
- Jahmal T. Davis; Hanson Bridgett LLP; San Francisco, CA for Lifecare Centers of America Inc.
- Dorothy S. Liu; Hanson Bridgett LLP; San Francisco, CA for Lifecare Centers of America Inc.
- Samantha A. Botros; Hanson Bridgett LLP; Los Angeles, CA for Lifecare Centers of America Inc.

**Facts:**             On July 11, 2018, plaintiff Kathleen Armstrong, 58, who worked as the admissions

**Facts:**

director for a skilled nursing facility in Menifee, which was owned and operated by Lifecare Centers of America Inc., headquartered in Cleveland, Tennessee, was terminated from her position. Armstrong claimed that she was terminated for reporting that she was not paid overtime wages as well as reporting negligent practices at the facility after her father was admitted there.

Armstrong sued Lifecare Centers of America Inc. She alleged whistleblower retaliation, defamation and labor code violations.

LCCA was founded in 1970 and operates more than 200 skilled nursing facilities throughout 28 states, including California. Each skilled nursing facility houses an average of 70 beds for patients, predominantly from the elder population (ages 65 and older).

Armstrong's direct supervisor was Rodger Groves, the executive director of the facility who worked with Armstrong as her supervisor for the last 13 years of her employment. In May 2018, Armstrong's father, Frank Ward, required care in her facility after a fall at his home. Armstrong was approved to admit her father into the facility for rehabilitation and general care. During the course of his stay in the Menifee LCCA facility, Armstrong discovered and reported to Groves that her father was left in a soiled diaper because there was not sufficient staff to assist Ward in using the toilet. Armstrong claimed she also discovered and reported that her father's dietary requirements had not been met for several days, leaving Ward malnourished.

Just days later, Armstrong reported that she was not informed of a fall her father experienced in the facility even though she suspected a fall occurred and directly asked the care team if a fall occurred, which she claimed they initially denied. After demanding "fall precautions" for her father, she claimed the facility provided some but not all safety precautions for a fall risk. Days later, Armstrong complained that Ward experienced another fall, while his sitter, a care team member assigned to watch Ward, allegedly fell asleep while watching media on a mobile device. On June 3, 2018, less than a month after Ward's admission, he became septic after aspirating chunks of hamburger meat into his lungs due to the facility's failure to provide puréed food as required by Ward's dietary orders. Ward was taken by ambulance to a nearby hospital where he died hours later. The hospital doctor advised Armstrong and her two sisters that the facility's neglect caused the death of their father and that the matter would be reported to the California Department of Health.

The day Armstrong's father died, she claimed the facility asked Armstrong to help complete required census reports. Armstrong returned to the facility at 8 p.m. that night and worked until midnight. While on bereavement leave, she claimed the company again asked Armstrong to come into complete required census reports. Armstrong claimed she was also required to keep a cell phone with her during this time to answer any after-hours calls to the admissions department. Armstrong claimed she performed all this work without complaint by her or the people she was helping. Historically, Armstrong was told that any after-hours work on the phone was "part of the job," and that she would not be paid for that time. Armstrong worked approximately 10 hours each week on her after

On June 25, 2018, Armstrong returned to work at the facility after her bereavement leave. She claims that she was excited to get back to the job she loved and looked forward to the distraction and sense of accomplishment helping patients and families provided. Armstrong's first day back was uneventful as she caught up with the work that accumulated in her absence. By this time, Armstrong and her siblings had decided to sue the facility for the negligent death of her father. While at work, Armstrong asked the director of medical records what steps she needed to take to obtain her father's care related records for her attorney.

Armstrong was informed that her attorney needed to send a subpoena to get the records. The next day, June 26, 2018, Armstrong was in her office when her supervisor, Groves, stopped by to check on her. Groves allegedly told Armstrong he would be resigning in the near future. Armstrong responded, "Well, I probably won't be around much longer, when the company learns that my family and me are suing the facility." When Groves inquired why she felt that way, Armstrong reported the incidents of June 3, 2018, that led to the death of Ward, including details of the negligent/incompetent care by the LCCA care team and the hospital's intended report to the state. Armstrong further added that her family also planned on making a report to the state.

In addition, Armstrong disclosed concerns about inadequate staffing, fraudulent government reporting and mold in the facility. In an attempt to assure Armstrong that she was safe in making this disclosure, Groves allegedly told Armstrong, "I'm the only person who would fire you here, and I'm not going to fire you." No other comment was made by Groves in response to the information provided by Armstrong.

Plaintiff claimed that within minutes of this conversation with Armstrong, Groves contacted his manager, regional director Sam Magtanong. Plaintiff claimed Groves defamed Armstrong by falsely claiming Armstrong stated that she could not do her job, she did not feel comfortable giving tours, and that she could not recommend the facility. Plaintiff claimed Groves also falsely reported Armstrong as stating, "The nurses are all incompetent," "The nurses here don't care," and "The nurses here can't even do their jobs." Magtanong allegedly republished this false information to Matthew Ham, the divisional vice president of LCCA, who at the time was in charge of all facilities in California, Nevada, Arizona and New Mexico. The false information was also allegedly relayed to Kelly Falcon, the corporate senior vice president of human resources for LCCA.

Based on this information, LCCA allegedly claimed that it became concerned Armstrong had a conflict of interest that could prevent her from performing her job. Plaintiff contended that no warning, conversation, or action was taken to advise Armstrong of the company's concern about her presumed potential conflict of interest.

Armstrong shared her office with two assistants who helped with potential resident tours,

answering questions and completing admissions related paperwork. On June 27, 2018, plaintiff claimed that Armstrong's assistant, Marissa Martinez, falsely reported to Groves that she observed Armstrong stealing confidential logs containing information about the care of her father and other residents who were in the facility at the same time.

Plaintiff contended that Martinez falsely claimed Armstrong folded up the logs and put them in her purse. Plaintiff claimed that if true, this allegation would mean Armstrong committed the crime of stealing confidential medical records pertaining to 58 different patients. Plaintiff contended that at the time, Martinez was regarded as a dishonest employee with chronic poor performance, who Armstrong was in the process of replacing. Plaintiff noted that Groves was the next-door neighbor of Martinez and a close family friend of her parents and Groves frequently referred to Martinez as his "other daughter." Rather than asking Armstrong about the allegation, LCCA managers, including Groves, Magtanong, Ham, Falcon and the legal department suspended Armstrong. At the time, Armstrong was meeting with a wrongful death attorney about her father's case. Groves approved this time off during their discussion on June 26.

Upon her suspension, rumors immediately went through the facility that Armstrong stole patient records and violated medical privacy laws. Armstrong only worked two-and-a-half days between the time she returned from bereavement to the time of her suspension. While on suspension, Armstrong was approached by a member of the housekeeping staff who told Armstrong that the rumor in the facility was that she had been fired. As of this time, Armstrong had been suspended for several days without any word regarding the specifics of why she was suspended or what next steps would entail. Approximately one week after her suspension, on July 6, 2018, Armstrong was called into an investigatory meeting where she was asked to turn in her after hours' phone and building keys. During this meeting Armstrong denied taking the forms. Following the meeting, Groves allegedly defamed Armstrong again falsely claiming, once more, that Armstrong stated she could not do her job because of her negative feelings about the facility killing her father.

On July 9, 2018, the company decided the allegations of stealing records could not be substantiated because multiple records unrelated to Ward were also missing from the facility. Further, other witnesses present denied any wrongdoing by Armstrong. Martinez was the only witness who claimed to see Armstrong steal the records. Plaintiff contended though that after the company determined the theft allegations could not be substantiated, it decided to fire Armstrong anyway because of her alleged comments about refusing to do her job, as well as the comments she made criticizing the facility for the neglect of her father. Ham was identified as the "ultimate decision maker" in consultation with Falcon and the legal department.

The company allegedly directed Groves to "document" his conversations with Armstrong from June 26 and July 6 in a memorandum that was never provided to Armstrong. That same day Armstrong was asked to come to a meeting on July 11, 2018. On July 11, 2018, Armstrong was waiting in the lobby for her meeting with Groves. While waiting, a nurse assistant approached Armstrong to say she was sorry Armstrong had been fired. Plaintiff contended that apparently everyone in the facility knew Armstrong was being fired, except for Armstrong.

Once called into the meeting, Armstrong observed that Magtanong and Ham were present in addition to Groves. Two documents were on her bosses' desk, one facing up and the other facing down. Armstrong was informed that she was cleared of the medical privacy allegations, but the company was terminating her employment anyway because she allegedly was making comments throughout the facility that "could affect" morale and cause a loss in profits.

Armstrong was shown a termination form repeating the defamatory remarks initially communicated by Groves to his superiors. The termination form also noted "other associates" heard Armstrong make similar statements. Armstrong refused to sign the form, remarking, "That's not what I said," which Groves wrote onto the form. After Armstrong refused to sign the termination form, her managers then addressed the other paperwork on the desk, which was turned over so that she could not see it. The company allegedly indicated that although she was fired, Armstrong could choose to accept a severance. When Armstrong asked if the severance would require her to dismiss her claims regarding her father's death, she was allegedly told that it would. Armstrong responded, "Then I guess you will have to fire me."

Immediately in response, Armstrong was told she was fired. Groves then walked Armstrong through the facility past her co-workers to clean out her desk and load up her car.

LCCA claimed that all statements reported by Groves and Martinez were true. The company further claimed Armstrong actually did take the medical records, although it could not be substantiated. In addition, the company claimed Armstrong never made any complaints about the care that led to her father's death. The company asserted that the termination by Ham was due to her "conflict of interest" as opposed to the plain language of her termination form, which indicated she was fired for "expressing negative feelings about nursing care." The company further asserted Armstrong's lawsuit regarding her father had "nothing to do" with her termination and that the statements published by Groves were "substantially true."

**Injury:**     After her termination, Armstrong did not obtain new employment until 2020 when she began working for a different skilled nursing facility.

Armstrong began working at LCCA's skilled nursing facility in March 1997. Until her termination, Armstrong worked for LCCA for 21 years. Nearly the majority of her career was spent working as the admissions director of the Menifee facility. The admissions director of each LCCA facility is responsible for marketing and admissions of elders into the facility. As admissions director, Armstrong was also responsible for providing tours of the facility and ensuring the facility was a good fit for residents based upon their care needs. The admissions director is frequently the first contact families have with the facility. At all times during her employment, Armstrong claims she was regarded as an outstanding employee who represented "the gold standard" with regard to how an admissions department should be run at LCCA.

By 2023, Armstrong's new employer provided compensation in excess of the earnings she would have received from LCCA. As such, Armstrong had no claim for future lost earnings. However, after her termination, Armstrong claimed she experienced non-economic harm including stress, anxiety, depression, sleep disturbance, stress, worry, humiliation and damage to her reputation. Armstrong received no health treatment for these problems. Armstrong sought recovery for her unpaid wages, defamation damages and for her emotional past and future pain and suffering. She also sought recovery for punitive damages.

As to punitive damages, the company argued that none of the leaders involved in the termination, including the legal department, were managing agents. Moreover, the company could not afford punitive damages because it was unable to make a profit from the $600 million it collected in 2022 from patients.

**Result:**     The jury found for Armstrong on her claims and unanimously rejected the defense assertions finding Armstrong's protected activities contributed to her termination. The jury also determined 15 false statements were made about Armstrong causing harm to her reputation. The jury unanimously found a basis for punitive damages for whistleblower retaliation and defamation due to conduct by managing agents and ratification of same by the company. The jury awarded her a total of $11,183,000.

Kathleen Armstrong

$ 10,000,000 Punitive Exemplary Damages

$ 500,000 Non-economic Harm

$ 500,000 Defamation

$ 161,000 Wage Loss

$ 22,000 Unpaid Overtime

**$ 11,183,000 Plaintiff's Total Award**

## Trial Information:

| | |
|---|---|
| **Judge:** | Harold W. Hopp |
| **Demand:** | $2.9 million (C.C.P. 998), inclusive of fees and costs |
| **Offer:** | $500,000 (C.C.P. 998), inclusive of fees and costs |
| **Trial Length:** | 0 |
| **Trial Deliberations:** | 0 |
| **Post Trial:** | Plaintiff's counsel noted that an additional $100,000 will be added to the verdict due to prejudgment interest. Plaintiff's counsel added they will also seek an award of approximately $1.5 million to $2 million in attorney fees and costs. |
| **Editor's Comment:** | This report is based on information that was provided by plaintiff's counsel. Defense counsel did not respond to the reporter's phone calls. |
| **Writer** | Priya Idiculla |

Published by Verdict Search, the leading provider of verdict & settlement research

# TAB C

VerdictSearch

# Three workers fired after taking manager approved PTO: lawsuit

| | |
|---|---|
| **Type:** | Verdict-Plaintiff |
| **Amount:** | $80,252,412 |
| **State:** | California |
| **Venue:** | Sacramento County |
| **Court:** | Superior Court of Sacramento County, Sacramento, CA |
| **Injury Type(s):** | • *mental/psychological* - emotional distress |
| **Case Type:** | • *Intentional Torts* - Defamation<br>• *Employment* - Wrongful Termination |
| **Case Name:** | Melinda Brantley, Daniel Koos and Nicholas Lardie v. Zurich American Insurance Company, No. 34-2018-00246315-CU-DF-GDS |
| **Date:** | April 18, 2024 |
| **Plaintiff(s):** | • Daniel Koos, (Male, 0 Years)<br>• Nicholas Lardie, (Male, 0 Years)<br>• Melinda Brantley, (Female, 0 Years) |
| **Plaintiff Attorney(s):** | • Lawrance A. Bohm; Bohm Law Group, Inc.; Sacramento CA for Melinda Brantley,, Nicholas Lardie,, Daniel Koos<br>• Kelsey K. Ciarimboli; Bohm Law Group, Inc.; San Diego CA for Melinda Brantley,, Nicholas Lardie,, Daniel Koos<br>• Jack C. Brouwer; Bohm Law Group, Inc.; Sacramento CA for Melinda Brantley,, Nicholas Lardie,, Daniel Koos<br>• Chapman C. Chan; Bohm Law Group, Inc.; San Diego CA for Melinda Brantley,, Nicholas Lardie,, Daniel Koos |
| **Plaintiff Expert (s):** | • Brad Abbott M.B.A.; Economics; Sacramento, CA called by: Lawrance A. Bohm, Kelsey K. Ciarimboli, Jack C. Brouwer, Chapman C. Chan |
| **Defendant(s):** | • Zurich American Insurance Company |

| | |
|---|---|
| **Defense Attorney(s):** | • Jessica S. Pliner; O'Hagan Meyer, LLP; San Francisco, CA for Zurich American Insurance Company |
| | • Marcus J. Lee; O'Hagan Meyer, LLP; San Francisco, CA for Zurich American Insurance Company |
| **Defendant Expert(s):** | • Karl Erik Volk M.A.; Economics; San Francisco, CA called by: for Jessica S. Pliner, Marcus J. Lee |

**Facts:**

On Dec. 20, 2017, plaintiffs Melinda Brantley, Nicholas Lardie and Daniel Koos, who were all team managers at Zurich American Insurance Company, were terminated from their positions. Prior to this, Zurich was investigating plaintiffs' use of paid time off and whether such time was recorded in the system.

Plaintiffs were told that an interim assistant vice president reviewed information, causing her to question whether certain days plaintiffs were not at work should have been entered into the PTO system. At this point, plaintiffs were not told what specific dates were in question, only that there were dates where plaintiffs appeared not to be at work and no PTO was entered in the system.

Andrew Atkinson, who worked in Zurich's Human Resources Department, indicated he would forward an email with the specific dates in question and asked that plaintiffs provide a response indicating where they were on those days. In response, each plaintiff explained on the call that they had entered all PTO days into the system.

Plaintiffs further explained that some of the dates in question were work-from-home days or were "Omen Days," a benefit which their supervisor Christopher Omen provided as an incentive reward outside of the official PTO system.

Omen supervised approximately 50-70 employees located in three separate offices located in San Francisco, Sacramento and Las Vegas. Omen was one of seven assistant vice presidents managing Zurich workers' compensation claims in the US. All assistant vice presidents are supervised by a national vice president who reports to the "C-suite" of Zurich. Omen had full discretion to run the offices he managed as he saw fit.

Plaintiffs specifically indicated that this was an incentive provided to all employees and that it was not just limited to them. Ultimately, plaintiffs were informed they were terminated because they engaged in employee theft, lacked integrity, engaged in dishonest behavior and exhibited a total lack of leadership.

Brantley, Lardie and Koos each sued Zurich, alleging defamation.

In October 2017, Omen was terminated from his position, allegedly because the top performing Rancho Cordova branch failed a California State audit. Zurich maintained that Omen's termination was unrelated to his practice of giving employees "off the record" PTO.

Plaintiffs claimed that Neil DeBlock, a former peer of Omen's who later became Omen's boss, ultimately made the decision to terminate Omen, after their working relationship became strained. Plaintiffs claimed DeBlock then hired a former team manager and personal friend, Toneta Snyder, from his North Central team, to be one of his seven assistant managers, instead of any of the plaintiffs, who expressed interest in being promoted to Omen's job.

Omen had specifically identified Brantley and Lardie in his "succession" plan that he submitted to Zurich. Snyder was eventually promoted to vice president of the western region in 2022.

Plaintiffs reported to Snyder until they were fired. Afterward DeBlock hired another former North Central team manager who was also a friend of his and when the replacement departed, Snyder took over the role once sought by Lardie, Brantley, and Koos. Plaintiffs claimed that DeBlock and Snyder targeted them.

Plaintiffs claimed that initially DeBlock and Snyder analyzed a list of those having low PTO balances and ended with a list of four names. The fourth name was a team leader named Kari Herrera, though plaintiffs claimed Atkinson eliminated her from any investigation as she was found to have used zero hours of PTO in 2016 and 2017. Plaintiffs claimed none of them were asked for any information about their PTO usage before their key card access reports were pulled and only Herrera was excused, though Herrera was not applying to replace Omen and was not regarded as one of Omen's favorites, as they were.

Plaintiffs' counsel noted that DeBlock urged Atkinson to compare the building access information to the PTO report using false information, to show that Brantley had no badge entry for five consecutive days in June 2016. Plaintiffs' counsel contended that Zurich's own key card access report contradicted DeBlock's statement, and in fact, the report did not reflect five consecutive missed days for Brantley. Plaintiffs' counsel suggested that this example demonstrated DeBlock's history of falsely persecuting plaintiffs in an effort to remove them from the business.

Immediately after plaintiffs were fired, they contacted their former boss Omen to advise that they had been fired for using "Omen Days." Upon hearing this news, Omen sent text messages to Snyder. Among the text messages was a message in which he admonished her, stating that she should be "ashamed" and accusing her of being a "heartless puppet." After texting Snyder, Omen also texted DeBlock to report that Omen Days were approved by two vice presidents who filled the position prior to DeBlock. Neither Snyder nor DeBlock reported this information to the Human Resources investigator.

Defense counsel argued that the use of "Omen Days" was theft because, even though plaintiffs were authorized to use the time by Omen and his bosses, the plaintiffs, as top performing managers, should have known better. Defense further argued that even though no policy at Zurich forbade "off the record" PTO, plaintiffs' common sense should have allegedly told them it was wrong.

Plaintiffs' counsel noted Zurich failed to bring any employee from Omen's region that knew about the practice and thought it was wrong.

**Injury:**

Within three months after their termination all three plaintiffs found new jobs for different workers' compensation insurance companies, but with much lower seniority, benefits and pay. All three plaintiffs claimed to have suffered multiple symptoms of emotional distress from the alleged defamation, including, stress, irritability, anxiety, depression and damage to their reputation for having been labeled as thieves.

Brantley, Lardie and Koos all claimed emotional pain and suffering from the events and sought recovery for their loss of pay and emotional distress.

**Result:**

Brantley, Lardie and Koos were awarded a total of $80,252,412, inclusive of $25 million in punitive damages for each of them against Zurich.

Daniel Koos

$ 25,000,000 Punitive Exemplary D

$ 609,712 Lost Wages

$ 300,000 Reputation Damage

$ 300,000 Emotional Distress

**$ 26,209,712 Plaintiff's Total Award**

Nicholas Lardie

$ 25,000,000 Punitive Exemplary Damages

$ 456,326 Lost Wages

$ 300,000 Reputation Damage

$ 400,000 Emotional Distress

**$ 26,156,326 Plaintiff's Total Award**

Melinda Brantley

$ 25,000,000 Punitive Exemplary Damages

$ 2,286,374 Lost Wages

$ 300,000 Reputation Damage

$ 300,000 Emotional Distress

**$ 27,886,374 Plaintiff's Total Award**

**Judge:**          Jeffrey S. Galvin

**Demand:**         $2 million per plaintiff, inclusive of fees and costs

**Offer:**          None

**Trial Length:**   0

**Trial
Deliberations:**    0

**Post Trial:**     Plaintiffs are also entitled to prejudgment interest per their CCP 998 Offer to
                    Compromise. The total interest is approximately: $2,387,537.18.

**Editor's
Comment:**          This report is based on information that was provided by plaintiffs' counsel. Defense
                    counsel did not respond to the reporter's phone calls.

**Writer**          Priya Idiculla

# TAB D

**VerdictSearch**

## Woman wrongfully accused of sexual harassment: lawsuit

| | |
|---|---|
| **Type:** | Verdict-Plaintiff |
| **Amount:** | $9,102,108 |
| **State:** | California |
| **Venue:** | San Diego County |
| **Court:** | Superior Court of San Diego County, San Diego, CA |
| **Injury Type(s):** | • *mental/psychological* - emotional distress |
| **Case Type:** | • *Employment* - Retaliation; Wages and Hours; Sexual Harassment; Wrongful Termination |
| **Case Name:** | Sarah Freeman v. Bitchin' Inc., Bitchin' Sauce, LLC, Bitchin' Beach Club, LLC and Starr Edwards, No. 37-2022-00033240-CU-WT-NC |
| **Date:** | November 29, 2024 |
| **Plaintiff(s):** | • Sarah Freeman, (Female, 44 Years) |
| **Plaintiff Attorney(s):** | • Golnar J. Fozi; Fozi Dwork & Modafferi, LLP; Carlsbad CA for Sarah Freeman<br>• Jeremy M. Dwork; Fozi Dwork & Modafferi, LLP; Carlsbad CA for Sarah Freeman |
| **Plaintiff Expert(s):** | • Duane E. Bennett Esq.; General Investigations; Poway, CA called by: Golnar J. Fozi, Jeremy M. Dwork<br>• Gregory A. Kaseno C.P.A.; Economics; San Diego, CA called by: Golnar J. Fozi, Jeremy M. Dwork |
| **Defendant(s):** | • Bitchin' Inc.<br>• Starr Edwards<br>• Bitchin' Sauce LLC<br>• Bitchin' Beach Club LLC |

| | |
|---|---|
| **Defense Attorney(s):** | Brook T. Barnes; Snell & Wilmer; San Diego, CA for Bitchin' Inc., Bitchin' Sauce LLC, Bitchin' Beach Club LLC, Starr Edwards |
| | • Clint S. Engleson; Snell & Wilmer; San Diego, CA for Bitchin' Inc., Bitchin' Sauce LLC, Bitchin' Beach Club LLC, Starr Edwards |
| **Defendant Expert(s):** | • Brian J. Bergmark M.B.A., C.P.A.; Economics; San Diego, CA called by: for Brook T. Barnes, Clint S. Engleson |
| | • Maria Brady M.S., C.R.C., C.L.C.P.; Vocational Rehabilitation; Walnut Creek, CA called by: for Brook T. Barnes, Clint S. Engleson |
| | • Kymberly M. LeGolvan Esq.; General Investigations; San Diego, CA called by: for Brook T. Barnes, Clint S. Engleson |

**Facts:**

On March 24, 2022, plaintiff Sarah Freeman, 44, who was hired by Bitchin' Inc., Bitchin' Sauce LLC, Bitchin' Beach Club LLC and their CEO, Starr Edwards, to work at a beach club in Carlsbad as a recreational program lead, was terminated from her position. Freeman claimed her termination occurred just days after she reported that a supervisor had sexually harassed her and that she had been forced to clock out and continue working.

Freeman sued Edwards, Bitchin' Inc. and the company's aforementioned subsidiaries, alleging sexual harassment, retaliation and violations of California's Labor Code.

Freeman had initially been hired by the company in 2020 and over the next year and a half, she claimed she was misclassified, denied meal and rest breaks, denied overtime and subjected to sexual harassment by her direct supervisor. She had reportedly complained about her supervisor's workplace conduct, only for her complaint to immediately be relayed to the supervisor, who she says responded angrily and instructed her never to go over his head and report him again.

Following this incident, Freeman claims the supervisor's inappropriate behavior continued. She at one point confided her concerns to a co-worker, who in turn reported Freeman's complaint to the company owners, who then fired the supervisor for alleged misconduct. Though the misconduct that had led to the supervisor's termination was said to be unrelated to Freeman's allegations, in the course of the supervisor's termination, the supervisor was reportedly informed that part of the reason for his being terminated was due to the complaints made by Freeman. After his termination, the supervisor alleged for the first time that Freeman had sexually harassed him. The company decided to investigate the fired supervisor's allegations against Freeman.

Freeman's counsel contended that the fired supervisor's claims against Freeman came on the heels of his termination, despite his multiple stellar performance reviews of Freeman and a lack of evidence to support the allegation that Freeman had committed sexual harassment or misconduct of any kind.

At trial, Freeman's counsel argued that defendants' supposed investigation into sexual harassment by Freeman had been incomplete, biased, and motivated by defendants' desire

to protect themselves against potential liability, not to determine the truth.

The fired supervisor testified at trial that he only made the allegations against Freeman because he was upset that he had been terminated, and added that Freeman had never sexually harassed him in any way.

Other employees testified that they had never observed Freeman sexually harass the fired supervisor or engage in any other inappropriate behavior.

Defense counsel contended that the supervisor had not committed sexual harassment and claimed he had been fired for unrelated reasons. Defense counsel further contended that the investigation into allegations of sexual harassment by Freeman was thorough and fair.

**Injury:**

Aside from her allegations of sexual harassment from her supervisor, Freeman reported that she was denied payment for working overtime hours and that she was not given lunch or rest breaks.

Freeman claimed emotional pain and suffering from the events leading to her termination. She had not sought therapeutic treatment.

Freeman claimed a loss of $67,809 in past earnings and a loss of $486,319 in future earnings, due to the false basis for her termination that she alleged had negatively impacted her ability to secure comparable employment elsewhere.

Despite significant efforts to procure other employment, Freeman claimed to have been unable to find another full-time job since her termination. Additionally, her earnings since her termination have amounted to one-third of her salary while employed by the defendants.

Freeman's counsel asked the jury to factor in her unpaid wages, the loss of lunch and rest break violations (approximately $20,000), past and future lost earnings (approximately $550,000), and $1 million in damages for mistreatment by her supervisor.

Freeman's counsel further asked the jury to award punitive damages sufficient to deter similar conduct from the defendants in the future.

The defense asked the jury to award nothing to Freeman.

**Result:**    The jury found that defendants were liable to Freeman for the sexual harassment by her supervisor; retaliation against her for participating in a workplace investigation and for complaining of being forced to work off the clock; and for the loss of nearly a year and a half of unpaid overtime, as well as rest and meal break violations.

The jury awarded Freeman $4,054,108 in compensatory damages. The jury further found that Bitchin' Inc., Bitchin' Sauce LLC and Bitchin' Beach Club LLC acted with malice, oppression and fraud, such that the defendants were liable to Freeman for punitive damages.

After further presentation of evidence, the jury awarded Freeman punitive damages of $5,048,000 for a total verdict of $9,102,108.

Sarah Freeman

$ 5,048,000 Punitive Damages

$ 486,319 Future Loss of Earnings

$ 1,000,000 Past Non-Economic Damages

$ 2,500,000 Future Non-Economic Damages

$ 67,809 Past Loss of Earnings

**$ 9,102,128 Plaintiff's Total Award**

**Trial Information:**

**Judge:**    Cynthia A. Freeland

**Demand:**    $899,000

**Offer:**    $60,000

Published by Verdict Search, the leading provider of verdict & settlement research

**Trial Length:** 12 days

**Trial Deliberations:** 1.5 days

**Jury Vote:** 12-0

**Editor's Comment:** This report is based on information that was provided by plaintiff's counsel. Defense counsel did not respond to the reporter's phone calls.

**Writer** Priya Idiculla

**TAB E**

VerdictSearch

# Nurse fired as retaliation: lawsuit

**Type:**            Verdict-Plaintiff

**Amount:**        $41,499,965

**State:**           California

**Venue:**          Los Angeles County

**Court:**           Superior Court of Los Angeles County, Los Angeles, CA

**Injury Type(s):**    • *mental/psychological* - emotional distress

**Case Type:**        • *Employment* - Retaliation; Whistleblower

**Case Name:**    Maria Gatchalian v. Kaiser Foundation Hospitals, Kaiser Foundation Health Plan Inc., Helen Kersey and Southern California Permanente Medical Group, No. 21STCV15300

**Date:**            December 11, 2023

**Plaintiff(s):**      • Maria Gatchalian, (Female, 0 Years)

**Plaintiff Attorney(s):**
• David M. deRubertis; The deRubertis Law Firm, APC; Beverly Hills CA for Maria Gatchalian
• Taylor M. Prainito; Southern California Labor Law Group, P.C.; Los Angeles CA for Maria Gatchalian
• Michael A. Zelman; Southern California Labor Law Group, P.C.; Los Angeles CA for Maria Gatchalian

**Plaintiff Expert (s):**
• Anthony E. Reading Ph.D.; Psychology/Counseling; Beverly Hills, CA called by: David M. deRubertis, Taylor M. Prainito, Michael A. Zelman
• Heather H. Xitco M.B.A., C.P.A., C.F.F.; Economics; San Diego, CA called by: David M. deRubertis, Taylor M. Prainito, Michael A. Zelman

**Defendant(s):**          Helen Kersey

- Kaiser Foundation Hospitals
- Kaiser Foundation Health Plan Inc.
- Southern California Permanente Medical Group

**Defense Attorney(s):**

- Elizabeth A. Brown; Grube Brown & Geidt LLP; San Francisco, CA for Kaiser Foundation Hospitals, Kaiser Foundation Health Plan Inc., Helen Kersey, Southern California Permanente Medical Group
- Jasmine S. Horton; Grube Brown & Geidt LLP; Los Angeles, CA for Kaiser Foundation Hospitals, Kaiser Foundation Health Plan Inc., Helen Kersey, Southern California Permanente Medical Group

**Defendant Expert(s):**

- George Woods M.D.; Psychiatry; Oakland, CA called by: for Elizabeth A. Brown, Jasmine S. Horton

**Facts:**

In 2019, plaintiff Maria Gatchalian, a neonatal intensive care unit charge nurse, was terminated from her position at the Kaiser Permanente Woodland Hills Medical Center. Gatchalian had claimed things at the hospital began to change in 2017 when a new chief nursing executive, Valerie McPherson took over. Gatchalian alleged that various practices implemented by or during the tenure of McPherson compromised patient care and put patients at risk. In August 2017, Gatchalian made an internal Kaiser Hotline complaint, alleging that McPherson was not allowing charge nurses to provide patient care, even when needed. She also alleged that McPherson had engaged in other unsafe practices.

According to Gatchalian, Kaiser did not investigate this report. In the first half of 2018, Gatchalian also alleged that other nurses in the NICU, who she claimed were resentful due to Gatchalian's seniority and the benefits it gave her, began to marginalize her and not recognize her role as charge nurse. Additionally, Gatchalian alleged that their failure to communicate with her as charge nurse jeopardized patient care because the charge nurse needs to know all that is happening in the unit.

In June/July 2018, Gatchalian reported some of her concerns to Kaiser's HR department, including that her then supervisor, Jennifer Astacio, told her that McPherson said Gatchalian should not have reported her concerns about the unit through an unusual occurrence report (UOR), a formal reporting process that allows a care provider to report concerns occurring on a shift. A UOR is routed to Kaiser's risk management department who then routes the UOR to the appropriate department to conduct a root cause analysis and, if appropriate, implement corrective action.

In January/February 2019, Helen Kersey became the new director of maternal child health which included the NICU. Gatchalian alleged that Kersey implemented more practices that compromised patient care, specifically practices that resulted in understaffing which at times led to the NICU violating legally mandated nurse/patient staffing ratios. In early February 2019, Gatchalian met with Kersey at which time Gatchalian alleged that Kersey told her that McPherson does not want too many UORs. Gatchalian alleged she pushed back and told Kersey UORs are part of ensuring proper patient care and, if she felt one was required, she would submit one.

Over the next few months, Gatchalian submitted a series of reports, through the UOR process and otherwise, raising concerns about patient safety and quality of care, including situations involving understaffing resulting in actual or potential staffing ratio violations.

In April 2019, an anonymous letter came into Kaiser with a picture of Gatchalian sitting on a recliner next to an isolette — an incubator for sick babies — on her cell phone with her shoes and socks off and her bare feet touching the isolette. Kaiser interviewed Gatchalian regarding the incident and claimed she initially denied it, only admitting it after she was shown the photo.

Kaiser terminated Gatchalian claiming that her conduct of placing her bare feet on the isolette violated its infection control policies as well as its dress code policies, and that she was allegedly dishonest during her interview about the incident, a violation of Kaiser's principles of responsibility.

Gatchalian sued Kaiser Foundation Hospitals, Kaiser Foundation Health Plan Inc., Kersey and Southern California Permanente Medical Group, alleging whistleblower retaliation.

Gatchalian contended that her termination was in retaliation for her numerous protected disclosures. She further alleged that Kaiser Woodland Hills suffered from chronic understaffing which impacted the quality of care in the NICU and at times led to the NICU falling below legally-required staffing ratios, and that management serially discouraged her from submitting UORs because a UOR required a formal root cause analysis and had an accountability system in place where department management had to report back to risk management.

Gatchalian asserted that Kaiser did not want UORs submitted on these issues because the root cause of the problems was intentional and chronic understaffing, which Kaiser chose to do, and did not want to fix. Gatchalian also contended that Kaiser had a "cover-up culture," as shown by multiple instances in which reports or concerns were raised, but not investigated or, if investigated, white-washed.

The plaintiff's counsel offered comparative evidence of other similar offenses which did not lead to termination. Gatchalian agreed that her conduct in removing her shoes and socks and placing her bare feet on the isolette violated Kaiser's policies and should not have been done, however, she claimed the proper result should have been discipline far short of termination.

Kaiser contended that Gatchalian's conduct was outrageous and put the sick baby in the isolette at risk of harm, either through an infection or through the potential that Gatchalian could have knocked over the isolette. Kaiser also pointed to evidence that after the initial anonymous photo was submitted, additional anonymous submissions of the same photos were sent to Kaiser showing that the anonymous reporter continued to escalate the

situation because no action had been taken. Kaiser alleged it was concerned the reporter could post the photos to social media, causing harm to Kaiser's reputation.

**Injury:**

Gatchalian had worked at the hospital since 1989, first starting there as a registered nurse in the NICU. Gatchalian was not found to have sought psychological therapy following her termination. However, the plaintiff's forensic psychologist evaluated her and opined that she suffered from an adjustment disorder as a result of the investigation that led to her termination and then suffered a major depressive disorder following the termination.

The plaintiff's counsel argued that for many years Gatchalian had given solid work performance and no write-ups. Additionally, her counsel noted that Gatchalian had made some efforts to find work following her termination, but had still not secured other work and remained unemployed as of the trial. Gatchalian's economist expert testified that the present value of her past and future lost earnings was approximately $2.5 million. She sought recovery for her lost earnings and emotional distress. She also sought punitive damages for the alleged conduct of the defendants.

The defense counsel's retained forensic psychiatrist disagreed and found that Gatchalian had not suffered any psychiatric condition from the termination, but instead claimed her psychological testing showed malingering. Kaiser alleged Gatchalian failed to make reasonable efforts to mitigate her damages, pointing to what the defense suggested was a small number of job applications over four-plus years. Additionally the defense noted that Gatchalian's union had filed a grievance regarding her termination and was preparing to fight to get her job back, but Gatchalian withdrew the grievance opting to file a lawsuit instead.

**Result:**

On Dec. 11, 2023, the jury found for Gatchalian on her claim that her termination was retaliatory in violation of California Labor Code section 1102.5. The jury awarded Gatchalian $11,499,965 in lost wages and benefits and emotional distress. The jury also found that both Kaiser Foundation Hospitals and Kaiser Foundation Health Plan engaged in malice, fraud or oppression and in Phase II that same day, awarded $15 million against Kaiser Foundation Health Plan and $15 million against Kaiser Foundation Hospitals in punitive damages. Gatchalian's total award was $41,499,965.

Maria Gatchalian

$ 1,268,249 Past Lost Earnings

$ 1,231,716 Future Lost Earnings

$ 30,000,000 Punitive Exemplary Damages

$ 7,500,000 Future Pain Suffering

$ 1,500,000 Past Pain Suffering

**$ 41,499,965 Plaintiff's Total Award**

**Trial Information:**

| | |
|---|---|
| **Judge:** | Maurice A. Leiter |
| **Trial Length:** | 11 days |
| **Trial Deliberations:** | 2 hours |
| **Jury Vote:** | 12-0 (on all issues other than amount of punitive damages), 10-2 (on amount of punitive damages) |
| **Post Trial:** | As the prevailing party, Gatchalian will also be entitled to statutory attorney fees and costs. |
| **Editor's Comment:** | This report is based on information that was provided by plaintiff's counsel. Defense counsel did not respond to the reporter's phone calls. |
| **Writer** | Priya Idiculla |

**TAB F**

# CFO terminated from position after alleging violations

**Type:**              Verdict-Plaintiff

**Amount:**            $2,248,290

**State:**             California

**Venue:**             Los Angeles County

**Court:**             Superior Court of Los Angeles County, CA

**Injury Type(s):**    • *mental/psychological* - emotional distress

**Case Type:**         • *Fraud*
                       • *Employment* - Retaliation; Whistleblower
                       • *Contracts* - Breach of Contract
                       • *Corporations* - Breach of Fiduciary Duty

**Case Name:**         Jeffrey Qiuhong Yang v. Global Win Capital Corporation, Shanying International Holdings Corporation Limited and Kevin Yulin Jiang, No. 20STCV45192

**Date:**              November 19, 2024

**Plaintiff(s):**      • Jeffrey Qiuhong Yang, (Male, 0 Years)

**Plaintiff Attorney(s):**   • Brian G. Hannemann; Hannemann Law Firm; Upland CA for Jeffrey Qiuhong Yang
                             • Tamara S. Freeze; Workplace Justice Advocates, PLC; Irvine CA for Jeffrey Qiuhong Yang

**Plaintiff Expert (s):**    • Mark O. Falkenhagen; Economics; Los Angeles, CA called by: Brian G. Hannemann, Tamara S. Freeze

**Defendant(s):**      • Kevin Yulin Jiang
                       • Global Win Capital Corporation
                       • Shanying International Holdings Corporation Limited

**Defense Attorney(s):**
- Holly R. Lake; DLA Piper US; Los Angeles, CA for Global Win Capital Corporation
- Melanie E. Walker; DLA Piper US; Los Angeles, CA for Global Win Capital Corporation

**Defendant Expert(s):**
- Dawn Jones C.P.A.; Audits; , called by: for Holly R. Lake, Melanie E. Walker

**Facts:**

In October 2019, plaintiff Jeffrey Yang, who was chief financial officer for Global Win Capital Corporation, was terminated from his position. He alleged that he was terminated in retaliation for reporting what he believed to be unlawful activities by the company, including its use of inflated appraisals to procure loans and its receipt of approximately $80 million in financing from its China-based parent company, without following government regulations for the international transfer of money.

Yang claimed Global Win breached his executive employment agreement and stock appreciation rights (SAR) plan when he resigned for "good reason," as that phrase is defined in those agreements, thus failing to pay him over $1 million in severance pay and over $500,000 for his vested SAR rights.

In November 2020, Yang filed a complaint against Global Win, the China-based parent corporation, Shanying International Holdings Corporation Limited and; Kevin Yulin Jiang, an officer of both companies. The complaint alleged breach of contract, whistleblower retaliation, and wrongful termination claims based on the foregoing facts, as well as other tort and
contract-related claims that were later dismissed. The case continued against Global Win, only after Shanying was dismissed on jurisdictional grounds and all claims against Jiang were dismissed.

In January 2021, Global Win filed a cross complaint against Yang which alleged a breach of fiduciary duty claim at the time of trial. Specifically, Global Win alleged that Yang had breached his fiduciary duty by competing with Global Win during his employment relationship, receiving, among other things, more than $40,000 for moving expenses that he had not actually incurred and expenses for other employees to the company's detriment.

**Injury:** Yang sought contract damages totaling more than $1 million in severance pay and more than $500,000 for his vested SAR rights in connection with the alleged breach of his executive employment agreement and SAR Plan.

Yang also sought compensation for past and future lost earnings in connection with his wrongful termination and retaliation claims.

Yang had worked for Global Win between September 2017 and October 2019. Prior to trial, he had dismissed his claim for lost earnings past Jan. 28, 2020, when he began working for his new employer.

Yang also sought emotional distress damages and punitive damages.
Global Win sought compensatory damages in connection with its breach of fiduciary duty claim, including $376,184 in expense reimbursements that the defense alleged Yang improperly received or approved, more than $40,000 in improper housing expenses that Yang had reportedly fraudulently received, and more than $56,000 in consulting fees that Yang was said to have charged to Global Win in connection with Yang's competing side business.

**Result:** The trial court granted Global Win's motion for non-suit with respect to the issue of whether Yang was entitled to recovery on his breach of contract claim, based on his SAR plan, thereby eliminating his claim for more than $500,000 in SAR plan damages and leaving only his claim for severance pay, based on the breach of his executive employment agreement.

The jury found for Yang on his whistleblower retaliation, wrongful termination and remaining breach of employment contract claims, and awarded him $2,248,290.07, inclusive of punitive damages. The jury also found for Global Win on the company's cross complaint for breach of fiduciary duty and awarded $41,000 against Yang.

Jeffrey Yang

$ 800,000 Punitive Damages

$ 200,000 Past Emotional Distress

$ 1,080,000 Contract Damages

$ 168,290.07 Past Lost Earnings

**$ 2,248,290.07 Plaintiff's Total Award**

**Trial Information:**

| | |
|---|---|
| **Judge:** | Joseph M. Lipner |
| **Trial Length:** | 14 days |
| **Trial Deliberations:** | 3 days |
| **Editor's Comment:** | This report is based on information that was provided by plaintiff's counsel. Additional information was gleaned from court documents. Defense counsel did not respond to the reporter's phone calls. |
| **Writer** | Priya Idiculla |